STUART T. FULTON,

*Plaintiff and Respondent,*

vs.

SAM DES JARDINS, Defendant, and THURSTON BLOCK PLANT, INC., a Corporation,

*Defendant and Appellant.*

(No. 2482; February 6, 1951; 227 Pac. (2d) 240)

518

For the defendant and appellant the cause was submitted upon the brief and also oral orgument of Thomas A. Nicholas of Casper, Wyoming.

For the plaintiff and respondent the cause was submitted upon the brief and also oral argument of T. C. Daniels of Douglas, Wyoming.

## OPINION

BLUME, Justice.

This is an action brought by Stuart T. Fulton against Sam Des Jardins and Thurston Block Plant, Inc., a corporation. Sam Des Jardins made default and judgment was entered against him. A judgment for $461.50 in favor of plaintiff was rendered against Thurston Block Plant, and it was enjoined as asked in the petition. From that judgment the corporation has appealed to this court.

The plaintiff in his petition alleged that he was the original contractor upon a contract for construction for the State of Wyoming of a new livestock building at the Wyoming State Fair Grounds in Douglas, Wyoming. Under that contract he agreed to pay all labor for material used in the construction. Plaintiff further alleged that on June 11, 1949 the two defendants jointly agreed with the plaintiff to furnish 10,571 concrete blocks and the labor for laying the same, required for the walls of the said building, together with cement blocks and labor for laying the same for 94 windows in the building requiring 12 blocks each, the blocks to be furnished at the rate of 44½ cents per block, making a total contract price of $5003.96; that defendants dealt jointly with the plaintiff and made no agreement with respect to their separate interests; that it is the custom in the building trade in the Casper area of which Douglas is a part, that payments on the joint contract price for labor and blocks be made to the person on the job in charge of the receiving and laying of the same; that plaintiff paid Des Jardins the sum of $3400 on and before July 8, 1949; that on July 16 plaintiff advanced for labor to workmen the sum of $781.46 and that on July 18, 1949 he paid to the Thurston Block Plant, Inc., a corporation,

the sum of $1100, making a total so paid the sum of $5281.46; that these payments made to the defendant Des Jardins were made to him upon the express representation that he had the authority to receive the same for and on account of said contract for settlement between the defendants; that in addition to that he has incurred a liability of $184 for two workmen, namely Elmer Johnson and Robert Lundgren, for labor perfile a lien against the plaintiff and the building and the bondsmen of the plaintiff; that defendant Thurston bondsme nof the plaintiff; that defendant Thurston Block Plant, Inc., claims that there is due it, the sum of $1014.40, which is not true, and it should be and was asked to be enjoined from filing any claim with the State of Wyoming for this amount of money. Plaintiff asked for an accounting, and claimed the sum of $277.50 as overpayment on the cause of action above mentioned, and the sum of $241.90 upon another cause of action. This last cause of action, however, was disallowed by the court and plaintiff has not appealed in that connection. The defendant filed an answer denying the allegations of plaintiff except the allegation in reference to the contract with the State of Wyoming, and filed a cross-petition claiming that there is due it the sum of $1014.20 for 10,571 concrete blocks furnished at the rate of 20 cents for the construction of the building above mentioned.

The plaintiff testified that Thurston, president and manager of appellant, called him up on the telephone. That in that conversation he, Fulton, told Thurston that he was trying to get a price for cement blocks and labor. Thurston suggested that he knew a man—the defendant Des Jardins—whom he thought to be a good brickmason, and wanted to know if he, Fulton, would be interested in meeting them. The meeting was arranged and took place at Douglas. Plaintiff testifed

that: "I made it very definite to them (meaning both defendants) that I figured my job on the basis of blocks in the wall." Later "I called Mr. Thurston and asked him if he thought they (meaning both defendants) would consider a price of 44½ cents (per block), if they would take the job and labor at 44½ cents that I would make an agreement to that effect." Thurston stated that he would get into communication with Des Jardins. In addition, plaintiff wrote a letter to Thurston in which he "told him that the letter was to confirm what we had talked on over the phone; that I would agree to pay them (meaning both defendants) 44½ cents a block for the blocks in the wall." The letter was not in evidence, but Thurston admitted receiving it, and that he had turned it over to Des Jardins. The latter called plaintiff, stating that "they" would do the job for 44½ cents a block in the wall. Plaintiff was, to a large extent, corroborated by Mrs. Fulton; and Thurston admitted on the witness stand that the combined price for the material and labor was to be 44½ cents per block in the wall. That he accepted the offered contract is shown by the fact that the material was delivered. He denied, however, any joint liability with Des Jardins, but claimed that he was to receive 20 cents per block for the material. To resolve any conflict in the evidence was under many decisions of this court for the trial court and with its finding we cannot interfere. Hence, since the trial court found in favor of plaintiff, we must either consider the contract as creating a joint liability, as the trial court held, or, which is perhaps better in view of the fact that Thurston found and dealt with Des Jardins —that Thurston undertook to deliver the material and employed Des Jardins as his agent to put the blocks in the wall. The matter is not of the importance attributed to it by counsel, as may be noted by the discussion below, though consistent therewith.

Appellant pleaded in a reply filed in the case as follows: "That said plaintiff dealt with this defendant corporation through an agent of said corporation, and that said agent was not authorized to make any agreement to 'jointly' furnish material and labor with said Des Jardins." And counsel further contends that a corporation is engaged only in the manufacture and sale of cement blocks and, consequently, has no power whatever to enter into a contract involving responsibility for laying the blocks in the wall. Thurston testified as follows:

"Q. And are you an officer of the Thurston Block Plant, Inc.?

"A. Yes, sir, I am president of the corporation.

"Q. What is your authority as president of the corporation?

"A. As president of the corporation I have authority to call all corporation meetings which involve policy or change of policy, which is my responsibility to call meetings for such, and to operate as general manager of the Thurston Block Plant.

"Q. And in what business is Thurston Block Plant engaged?

"A. We are in the business of producing and selling blocks.

"Q. Do you in your business go into partnership with people who buy blocks to lay them for other people?

"A. We do not.

"Q. Do you have any facilities, such as supervisors or managers or foremen to handle such business?

"A. We have not."

Plaintiff did not plead that the contract entered into by the appellant was ultra vires. It is said in 19 C. J. S. 1029-1030 that where the defense of ultra vires is allowable to a corporation, it must be specially pleaded, unless that fact is shown by the allegations of the complaint. It is not so shown in the case at bar. The pleading in the reply above set out is not a plea of ultra vires

but merely a plea in regard to the authority of Thurston as president and general manager of the corporation to engage in the contract above mentioned. Hence, the question of ultra vires does not seem to be involved herein. Furthermore, the plea of ultra vires is not favored. Fletcher Cyclopedia on Corporations, Vol. 7, page 570, 19 C. J. S. 693. It is said in 19 C. J. S. 374 that the grant of express power "carries with it by implication a grant of the right to use all such powers as a natural person might properly and lawfully use to accomplish the same results under similar circumstances," and in 19 C. J. S. 376, it is stated that: "The field of corporate action with respect to the exercise of incidental powers is an expanding one." So that we are inclined to believe that the power to undertake to place the blocks in the wall cannot be said to be ultra vires, at least when executed, but may be said to be incidental to the power to sell them, unless expressly forbidden. That seems to be supported by the authorities. In the case of Temple Lumber Co. vs. Miller (Tex. Civ. App.) 169 S. W. 2d 256 a corporation was authorized to buy and sell lumber and building material. It agreed with the owner of realty to furnish all material and labor in construction of a house for an agreed sum. The court held that this contract was not ultra vires. The court stated in part: "To our minds, the contract involved here was one not prohibited by law nor by any principle of public policy. No good reason exists why defendant could not contract with plaintiff to sell him the materials to go into his house. We think it would logically follow that as an inducement to plaintiff to buy the materials from it, defendant could agree and bind itself to deliver the materials at its own expense, although its charter did not expressly authorize it to haul building materials. If it could deliver, then could it not even cut the lumber into desired lengths? Carrying the thought further, it could with propriety obligate itself to do many things

not expressly mentioned in its charter, when 'appropriate', 'convenient' and 'suitable' in the prosecution of the line of business expressly mentioned in the charter. An act of a corporation is said to be ultra vires when beyond the scope either of the express or implied powers of its charter. If the acts are within the scope of the implied powers of the corporation, they cannot be said to be ultra vires, yet some of our courts deem them such if they are not within the express terms of the charter. We think that if the act is not one prohibited by law or public policy, and it inures to the direct benefit of the corporation, and is executed, it is not, strictly speaking, ultra vires, and this is apparently the view taken by the trial court." In Nashville Breeko Block & Tile Co. vs. Hopton (Tenn. App.) 196 S. W. 2d 1010 it appeared that a corporation which manufactured and sold concrete blocks undertook to construct houses for the purpose of advertising them. It was held that this was not ultra vires, the court saying in part: "This house-building program was undertaken to demonstrate the suitability of complainant's product for low-cost houses, and to open up a new market for it in this field. This was incidental to the promotion of complainant's business and the attainment of the objects of its incorporation." And see State vs. Long-Bell Lumber Co., 321 Mo. 461, 12 S. W. 2d 64, 83.

Whether or not Thurston had authority, without authorization by the board of directors, to enter into the contract herein, including the putting of the blocks in the wall, is, of course, another question. We have not been favored by the citation of any specific authority on the subject. Thurston was both president as well as general manager of the corporation and as such, his powers should perhaps be considered to be larger even than that of a general manager. It is stated in Fletcher Cyclopedia Corporations (Permanent Edition) Vol. 2, page 317: "And a defense interposed by a corporation

that its agents had no authority to execute a contract on its behalf is looked upon with disfavor, especially where the contract has been executed in whole or in part. 'It is the policy of the law and the endeavor of the courts to hold corporations as well as natural persons to their contracts.' " See to the same effect Morgan vs. Cedar Grove Ice Co., 215 La. 741, 41 So. 2d 521 where the rule here mentioned was particularly emphasized. It is stated in 19 C. J. S. 469-470: "The general manager of a corporation, or an officer otherwise designated but occupying an analogous position, has general charge, direction, and control of the affairs of the corporation for the carrying on of the business for which it was chartered. His powers and authority are broad and include implied authority. * * * he may exercise all the powers which the board of directors could exercise or authorize under the same circumstances in the general management of the corporation business." Thus it is said in Barnett vs. Kennedy, 185 Okla. 409, 92 P. 2d 963, 968: "Where the president is given power as general manager of the business with full direction and charge thereof, he has prima facie power to make any contract or do any act which the directors could authorize or ratify, unless special limitations are put upon such power of which the party dealing with him has notice, unless the power to do the particular act is expressly given to another officer or agent." However, it seems to be held in many cases in any event, that the power of a general manager is not as broad as the powers of a board of directors. It is said in Vol. 2, Fletcher Cyclopedia supra, page 612: "The test seems to be whether the act is within the scope of the 'ordinary business' of the corporation. If it is, then, as already stated, the manager has power. On the other hand, his authority does not extend to any matters or transactions which are not properly incident to the management of the ordinary business." We know that corporations which

sell machinery or certain mechanical appliance generally or at least frequently undertake to install it. So, too, we know that some lumber companies, which probably have only the power to sell lumber, engage in the construction of buildings. Even if such construction is let out to a subcontractor, the lumber company is ultimately responsible for the payment of labor in connection therewith. So part of the membership of this court, thinking that the trial court did not necessarily have to credit the testimony of Thurston as to the limited scope of the ordinary business of appellant, believes that the court had the right to find that Thurston, as president and general manager of appellant, had the authority, incidental to others, to agree to lay the cement blocks in the wall, particularly in view of the fact, as shown by the evidence, that he was anxious to sell the blocks in order to meet competition. In view of the absence of authority on the subject however we naturally hesitate to express any definite opinion on the subject, particularly in view of the fact that the case can be substantially disposed of on another theory, on which the trial court and plaintiff's counsel have laid emphasis, but on which counsel for appellant is in the main strangely silent.

Plaintiff testified that Thurston, the president and general manager of the appellant, told him to make all payments to defendant Des Jardins; that Thurston called him up over the phone a few days before July 18, 1949 asking about the payment for the material but asked him not to say anything about it to defendant Des Jardins; that on July 18, 1949 was the first time that he heard anything about separate payments to be made to Des Jardins and to the Thurston Block Plant, on which date there was furnished to him a statement claiming from him the sum of $1014.20; that prior to that time and as late as July 16, 1945 the statements for the amount due for the cement blocks were rendered

to the defendant Des Jardins, stating that those blocks were sold to him. On July 18, the attorney for the appellant wrote a letter to Fulton, stating that appellant looked to plaintiff for the payment of the amount due for the cement blocks. It seems that on that day plaintiff, Des Jardins and Thurston met at Douglas. Plaintiff paid $1100 to appellant at that time. Explaining that plaintiff stated: "It was given by me after I tried to make final settlement with Des Jardins and I didn't feel that I could because of Thurston's claim for money on the blocks. * * * I gave him that money; he came down and said he needed the money badly in his business; that he hadn't gotten money from Des Jardins and I gave that as partial payment of the blocks that Des Jardins should have paid him." Thurston in substance admitted the testimony of the plaintiff as to payments to be made to Des Jardins. Thus he was asked:

"Q. 350. I have forgotten, did I ask you what you told, if anything, Mr. Fulton, as to who was to pay for the blocks? Will you please tell the court what if anything was said?

"A. That was in conversation when he asked if he should pay for the blocks direct. At that time I told him that due to the union rules and regulations that material should be paid through a masonry contractor, that he could pay for the blocks through Des Jardins, but still his responsibility to see it was paid.

"Q. 390. You stated this morning that you told Mr. Fulton that it was a union custom, a building custom or a requirement of the union somehow, that the contractor, the contractor be paid for the labor and material, and he pay the materialmen, is that right?

"A. That's right.

"Q. How long has that custom existed, has it been usual in your practice?

"A. It is practice here in the Casper area.

"Q. Then you expected, then you expected the money to be paid to Mr. Des Jardins and by him paid to you, did you not?

"A. Yes."

Again he was asked:

"Q. 448. You then told him (the plaintiff) to pay Mr. Des Jardins and he would pay you?

"A. I would have to answer yes."

It is clear, accordingly, that the trial court was fully justified in finding that the appellant herein directed the plaintiff to pay Des Jardins the amount due to the former; in other words, that appellant appointed Des Jardins as its agent to collect whatever sum was due to the appellant. In view of that fact, the argument that plaintiff was negligent in not notifying appellant that he had paid Des Jordins is of no force. Nor is the argument of any weight that plaintiff agreed with the state to pay for all material and labor, for there is no reason why that provision could not be satified in the manner in which it was done in the case at bar. Now on June 27 payments were made to Des Jardins as follows: June 27, 1949—$100.00; July 1, 1949—$2500.00; July 8, 1949—$800.00—a total of $3400.00. On July 16 plaintiff paid workmen on the job the sum of $781.46. Counsel for appellant argues that Fulton may have been a mere volunteer in paying these workmen, but there is no merit in that. Fulton testified that these payments were made directly to the workmen because Des Jardins failed to pay them, and that he made the payment direct in order to receive a labor-release from them. Adding the foregoing amount of $781.46 to $3400 paid directly to Des Jardins makes a total of $4181.46. Thurston as hereinbefore stated, fully admitted that the combined price for material and labor should be 44½ cents per block, or a total of $5003.96. He knew that labor was required to be paid, so that the authorization of payments to be made to Des Jardins must be construed as

extending to the payments of that sum. It did not, of course, imply that the plaintiff was authorized to make any overpayments, at least insofar as plaintiff had knowledge of the amount required to be paid to workmen. Subtracting the sum of $4181.46 from the amount due from plaintiff, namely from $5003.96, there was left due from the plaintiff as of July 18, 1949, the sum of $822.50. Instead of paying that amount he paid to Thurston on that date the sum of $1100 or an overpayment of $277.50. All payments had been made by check, issued within approximately two weeks previous to July 18, 1949, so that on the latter date plaintiff knew perfectly well how much he had previously paid and that only the sum of $822.50 instead of $1100 was due as of that time insofar as his knowledge extended. He did not testify that he was ignorant of the facts as they existed at that time. Consequently the overpayment of $277.50, as of that time, cannot be considered as a payment made by mistake but must be considered as a payment voluntarily made, and probably in order to settle the controversy which then existed with Thurston, for the latter at that time insisted as hereinbefore stated that plaintiff was responsible for the amount of money due for the cement blocks. We must accordingly, insofar as proper, apply the rule stated in 40 Am. Juris. 820-823 as follows: "It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. * * * Although the character of a payment as voluntary depends in each case upon its own peculiar facts, a rule which will furnish a safe guide in the determination of particular cases is that where a person pays an illegal demand, with a full knowledge of all the facts which render the demand illegal, without an immediate and urgent

necessity therefor, unless it is to release his person or property from detention or to prevent an immediate seizure of his person or property, such payment is voluntary." And in 48 C. J. 734-737, it is said: "Except where otherwise provided by statute, it is a well-settled general rule that a person cannot, either by way of set-off or counterclaim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment existed. * * * A voluntary payment, within the meaning of the rule that such a payment cannot be recovered, means a payment made by a person of his own motion, without compulsion; a payment made without a mistake of fact or fraud, duress, coercion, or extortion, on a demand which is not enforceable against the payor, instead of invoking any remedy or defense which the law affords against such demand; and whether in a given case a payment is voluntary depends on the facts of the particular case, as indicating an intention on the part of the payor to waive his legal rights. A voluntary payment implies a legitimate cause; and, in the absence of compulsion it includes a payment made on an illegal claim or demand with knowledge of its illegality or groundlessness." Evidently, subsequent to July 18, 1949, however, plaintiff discovered that there was due to Elmer Johnson and Robert Lundgren for laying blocks on the job in question, the sum of $172.98 (not $184.00 as mistakenly claimed in the petition). He paid these amounts sometime in September and November 1949, because Des Jardins had failed to do so. He evidently had no knowledge of the facts in that connection on July 18, 1949, so that to that extent the payment made to appellant should not be regarded as a voluntary payment, but as one made by mistake, and the amount of $172.98 should be permitted to be recovered against the appellant. Judging the record as a whole, it would

seem to be clear that the reason that appellant was not paid in full was due to the betrayal of confidence reposed in Des Jardins by Thurston, although we should perhaps, in that connection, and in mitigation, state that Des Jardins paid appellant the sum of $700.00 on July 1, 1949, which was paid to the latter by plaintiff, and which, at least morally if not legally, should have been credited to the job here involved, but which Thurston arbitrarily credited on a Casper job. See Fawkes vs. Curtis, 133 Ore. 20, 286 P. 981, and authorities cited, 48 C. J. 651, Section 101. The check given for this amount was made out at Douglas, and was drawn on the Converse County Bank at that place. Thurston admitted that Des Jardins had no other job at Douglas, and the claim that Thurston did not know the source of the money would tax our credulity.

Other arguments advanced in the brief of counsel for appellant have been carefully considered, but are not, we think, well taken. The judgment of the trial court against the defendant is accordingly reduced to the sum of $172.98, and as so modified is affirmed. The respective parties should pay their own costs on this appeal, no costs to be taxed for the briefs.

*Affirmed.*

KIMBALL, C. J., and RINER, J., concur.