COMMERCIAL UNION INSURANCE COMPANY, a Massachusetts Corporation, Appellant (Plaintiff below),

v.

Robert POSTIN; Volk and Harrison; Ketchum, Konkel, Ryan and Fleming, now known as Ketchum, Konkel, Barrett, Nickel and Austin, Inc.; and Milo Ketchum, Appellees (Defendants below).

No. 5189.

Supreme Court of Wyoming.

May 2, 1980.

Bard Ferrall and King Tristani, Cheyenne, for appellant.

Ellen Crowley, Cheyenne, and William H. Knapp, of Knapp & Lee, Denver, Colo., for Postin, appellee.

James W. Owens, of Murane & Bostwick, Casper, for Volk and Harrison, appellees.

A. Joseph Williams, of Guy, Williams & White, Cheyenne, for Ketchum, Konkel, Barrett, Nickel and Austin, Inc., and Milo Ketchum, appellees.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

ROSE, Justice.

This appeal calls up the issue of whether or not an insurance company will, under a qualified subrogation policy provision, have a cause of action against alleged tortfeasors for damages the company paid upon a claim resulting from an inherent or latent defect when such cause of damage is specifically excluded from coverage.[1]

The case was decided against the insurance company on a motion for summary judgment in the trial court.

We will affirm.

We will hold that the insurance company, under the doctrine of *legal or equitable subrogation*—did not make payment under compulsion, had no interest of its own to protect, and was, therefore, a mere volunteer. The company, therefore, could not recover against alleged third-party tortfeasors under this theory of subrogation. We will also hold that, since there was no contract by which the insured assigned effective subrogation rights to the insurance company under the facts of this case, the company cannot, therefore, recover against alleged tortfeasors in reliance upon the doctrine of *conventional or contractual subrogation.*

Having resolved the appeal in the area of subrogation, it will not be necessary to consider the statute-of-limitations issue raised in the briefs.

FACTS

The Cheyenne, Wyoming, Air Terminal Building, which was built by the City of Cheyenne, Wyoming (herein referred to as "Cheyenne" or "the City"), was substantially completed in 1960, and on July 2, 1975, a portion of the roof collapsed. At that time the building was insured by appellant-plaintiff, Commercial Union Insurance Company, under a policy which excluded coverage for inherent or latent defect. Even so, acting on an insurance adjuster's report which recognized the cause of collapse in all probabil-

---

* ROONEY, J., having recused himself from participation in this case, GUTHRIE, J., Retired, was assigned, having been retained in active judicial service pursuant to Article 5, Section 5, *Wyoming Constitution, and Section 5–1–106(f),* W.S.1977, by order of this court entered on January 1, 1979.

1. The specific policy language excludes "Loss caused by: 1. wear and tear, deterioration, rust or corrosion, mould, wet or dry rot; *inherent or latent* defect; . . . ." (Emphasis supplied.)

ity to be from latent or inherent defect, i. e., "design of this building," the company settled with the insured City and then brought suit against defendants-appellees, architects and engineers. The amended complaint charges that latent defect was the cause of the collapse and resultant damages.

For purposes of this opinion, we assume that immediately after collapse, appellant's adjuster believed the probable cause to be inherent or latent defect. The opinion assumes that the cause was, in fact, latent or inherent defect and, furthermore, the trial judge had the right to make that assumption. This assumption is permissible since it is upon this cause that the appellant has rested its case both here and in the trial court and, no other theory of liability having been advanced, the parties and the concerned courts are bound to this concept of recovery.

The two relevant subrogation paragraphs of the policy will be referred to as "Subrogation Paragraph 1 or 2," and they are these:

1. "This company may require from the insured an assignment of all rights of recovery against any party for loss to the extent that payment therefor is made by this Company."

2. "In the event of any payment *under this policy* the Company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights." (Emphasis supplied.)

There is no assignment under Paragraph 1 aforesaid and no assignment of subrogation rights in the record in any respect except that which is contained in the above-quoted Paragraph 2.

## ISSUE

The issue is whether or not subrogation Paragraph 2 supports the insurance company's right to subrogation, given the facts of this case.

## THE NATURE OF SUBROGATION

Subrogation has been defined as "the substitution of another person in the place of a creditor, so that the person in whose favor it [subrogation] is exercised succeeds to the rights of the creditor in relation to the debt." *Criss v. Folger Drilling Company*, 195 Kan. 552, 407 P.2d 497, 500 (1965). (Bracketed matter supplied.) This would mean here that the insurance company seeks to step into the shoes of the City in relation to any "debt" the appellees-tortfeasors owe the City because of their alleged negligence.

### Two Types of Subrogation

■ There are two kinds of subrogation—legal or equitable and conventional. Legal or equitable subrogation arises by operation of law, and conventional subrogation arises by contract.[2]

### Legal Subrogation

■ The right to legal subrogation occurs upon the payment of the debt by the subrogee for the subrogor. Couch on Insurance 2d § 61:2, pp. 238–239. An insurer has the right to recover for damages that it is obligated to pay to an insured *under its policy*. *Couch*, supra, § 61:4, p. 239.

The United States Court of Appeals, Fourth Circuit, has said:

" 'Where the tortious conduct of a third person is the cause of a loss *covered by an insurance policy*, the insurer, upon payment of the loss, becomes subrogated pro

2. We said in *Wyoming Building & Loan Ass'n v. Mills Const. Co.*, 38 Wyo. 515, 269 P. 45, 48 (1928):

"The right of subrogation may arise and sometimes must arise from contract. This is conventional subrogation. The right is some-times given in the absence of contract, is then a creation of the court of equity, and is given when otherwise there would be a manifest failure of justice. This is legal subrogation. . . ."

tanto by operation of law to whatever rights the insured may have against the wrongdoer.'" *United States v. South Carolina State Highway Dept.*, 4 Cir., 171 F.2d 893, 898 (1948), citing *Rivers v. Liberty National Bank*, 135 S.C. 107, 133 S.E. 210. (Emphasis supplied.)

■ With respect to whether the insurance company has paid *"under its policy,"* (Subrogation Paragraph 2 language) it is a defense in legal or equitable subrogation to show that the company paid as a mere volunteer.

## VOLUNTEERS

### (Compulsion and Protectable Interest)

### Payment for Harm not Covered

*Couch*, supra, § 61:52, pp. 269–270, puts the volunteer rule this way:

"While the right of subrogation is not dependent upon legal assignment, or upon contract, agreement, stipulation, or privity between the parties to be affected by it, *the person who pays the debt must not be a mere volunteer, for the payment must have been made under compulsion,* or for the protection of interest of the person making it in discharge of an existing liability which must be fully satisfied.[3] Hence, an insurer which pays a loss for which it is not liable thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an agreement therefor." (Emphasis supplied and footnote ours.)

The author goes on to say:

"The principle that the insurer is not subrogated when it makes a voluntary payment has been applied even though the 'voluntary' status of the payment could not be determined until the jury's verdict established that the insurer had not been obligated to make such payment. . . ." *Couch*, supra, § 61:54, p. 270.

■ The insurance company will be regarded as a volunteer when it purports to pay under its policy but where—in fact—the payment is made for harm that was not covered.

*Couch*, supra, § 61:54, p. 271, says:

3. Couch cites the following for this proposition: "*Standard Marine Ins. Co. v. Scottish Metropolitan Assur. Co.* (CA6 Ohio) 39 F.2d 436, affd. 283 U.S. 284, 51 S.Ct. 371, 75 L.Ed. 1037 (marine policies on cargo lost by collision and fund recovered by insured divided between insurers); *United States Fidelity & G. Co. v. Sweeney* (CA8 Mo.) 80 F.2d 235; *Shertzer v. Williams*, 232 Ala. 558, 168 So. 573; *London & Lancashire Indem. Co. v. Tindall*, 377 Ill. 308, 36 N.E.2d 334; *Bonnie v. Maryland Casualty Co.*, 280 Ky. 568, 133 S.W.2d 904; *American Farmers Mut. Auto. Ins. Co. v. Riise*, 214 Minn. 6, 8 N.W.2d 18; *Agricultural Ins. Co. v. A. Rothblum, Inc.*, 147 Misc. 865, 265 N.Y.S. 7; *United States F. & Guar. Co. v. Bramwell*, 108 Or. 261, 217 P. 332, 32 A.L.R. 829; *Conant v. Giddings*, 65 R.I. 79, 13 A.2d 517; *American Surety Co. v. Hamrick Mills*, 191 S.C. 362, 4 S.E.2d 308, 124 A.L.R. 1147; and *Cook v. Cook*, 110 Utah 406, 174 P.2d 434."

"Where automobile purchaser executed chattel mortgage in favor of financing bank and bank failed to record the mortgage and automobile was seized by a creditor and purchaser defaulted in payments to bank, insurer bringing action against purchaser could not recover on proof that it had paid the bank the sum due it by the purchaser under a policy of insurance absent proof of the insurer's contract with the bank, since recovery could not be based solely on the fact that insurer had paid the bank without proof that it was obligated to do so. *Security Ins. Co. v. Mangan*, 250 Md. 241, 242 A.2d 482.

"Fidelity insurer could maintain subrogation action as against contention that there was no proof that it had any obligation to make payments under the policy because payee was not an insured, under evidence that the payee was either not a separate legal entity from the insured or was a subsidiary over which the insured had assumed active management and exercised financial control. *Lumbermens Mut. Casualty Co. v. Jamieson*, 251 Or. 608, 447 P.2d 384.

"Title insurer could not recover from property owner amount of its payment satisfying tax lien on property, on theory that it became subrogated to rights of its insured and government, where insurer was under no legal compulsion to make payment except as required by contract with its insured, and where owner was not a party to that contract, did not request insurer to make payment, and did not affirm or approve insurer's act of doing so. *Chicago Title Ins. Co. v. Eynard*, 81 Misc.2d 931, 367 N.Y.S.2d 399, affd. 84 Misc.2d 605, 377 N.Y. S.2d 895."

*"Where the harm for which the insurer has indemnified the insured is not covered by the policy, the making of such payment to the insured is deemed 'voluntary,' and no right of subrogation arises. . . ."* (Emphasis supplied.)

In this regard, see *Hartford Fire Insurance Company v. Payne*, 28 Ga.App. 655, 112 S.E. 736 (1922), where the insurer paid a loss under an insurance leakage policy for which it was not liable. It was not entitled to be subrogated to the claim of the insured against occupants of the building in which the sprinkler system burst. The court held that when the insurer is not liable for the loss because the insured property had been removed from the premises, it cannot pay the loss and, upon receiving an assignment from the insured, recover against the party whose negligence caused the loss.

In *Nationwide Mutual Ins. Co. v. Weeks-Allen Motor Co.*, 18 N.C.App. 689, 198 S.E.2d 88 (1973), where the insured was involved in a collision allegedly caused by a defective master brake cylinder, insurer, who settled the claim without an adjudication of liability, did so voluntarily and did not succeed to the rights of its insured against the manufacturer, distributor and seller of the distributor.

In affirming summary judgment for the defendants, the court said:

"Plaintiff [insurance company] admitted that its policy of insurance required it to pay on behalf of its insured all sums which its insured should become *legally obligated to pay* as damages. Plaintiff further admits that it settled with all the claimants without an adjudication of liability because it was able to settle all claims within the limits of its policy. Plaintiff by paying the funds in settlement of claims for damages did so voluntarily. Even though suits had been filed, plaintiff's liability under its policy had not arisen. Therefore, because plaintiff was a volunteer in paying the claims, it did not succeed to the rights of its insured. . . ." (Emphasis in original text) 198 S.E.2d at 92.

In *Greenville Shipbuilding Corp. v. Hartford Acc. & Ind. Co.*, N.D.Miss., 334 F.Supp. 1228, 1237–1238 (1971), aff'd, 5 Cir., 460 F.2d 1063 (1972), the federal court, applying Mississippi law, was confronted with the situation that the "wrong" or "volunteer" insurance company had settled a claim. The "volunteer" company sued to collect from the insurance company under whose policy the claim should have been paid. The court said:

"... The rule is clearly stated in *Southwest Mississippi Electric Power Association v. Harragill*, 254 Miss. 460, 182 So.2d 220, 223 (1966) where the court said:

"'The authorities hold that to recover indemnity it is necessary for the plaintiff to allege and prove that he was legally liable to the person injured, and consequently, paid under compulsion. Otherwise, the payment is a voluntary one for which there can be no recovery. (Citations omitted).

"'This Court has declined to extend aid to those who make voluntary payments for which they were not legally liable. The basic purpose of courts, as far as civil cases are concerned, is to extend aid to those who have not been able by lawful means to aid themselves, and relief is not available to those who have neglected to take care of their interests. If an unjust demand is made upon a party for that which he does not owe, when he knows or ought to know all the facts, he must avail himself of the means the law affords and resist the demand.'

"Since the death of Duke resulted solely from the negligence of . . ., Kausler's settlement of the claim was voluntary on its part, and plaintiffs cannot recover . . . .

"It is recognized that this decision works a hardship on Kausler. The court, however, cannot extend aid to one who has made a voluntary payment for which it was not legally liable. Kausler was under the duty to avail itself of the means the law affords and resist the demand. . . ."

See, also, *Bonnie v. Maryland Casualty Co.*, 280 Ky. 568, 133 S.W.2d 904, 906 (1939); *Conant v. Giddings*, 65 R.I. 79, 13 A.2d 517 (1940); and *Loman v. Harrelson*, 437 S.W.2d 123, 126 (Mo.App.1968).

We embraced the volunteer doctrine identified by *Couch*, supra, and the above authorities when, in *Fulton v. Des Jardins*, 67 Wyo. 517, 227 P.2d 240, 245 (1951), we said:

". . . We must accordingly, insofar as proper, apply the rule stated in 40 Am.Juris. 820–823 as follows: 'It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. * * * Although the character of a payment as voluntary depends in each case upon its own peculiar facts, a rule which will furnish a safe guide in the determination of particular cases is that where a person pays an illegal demand, with a full knowledge of all the facts which render the demand illegal, without an immediate and urgent necessity therefor, unless it is to release his person or property from detention or to prevent an immediate seizure of his person or property, such payment is voluntary.' And in 48 C.J. 734–737, it is said: 'Except where otherwise provided by statute, *it is a well-settled general rule that a person cannot, either by way of set-off or counter-claim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress or extortion, although no obligation to make such payment existed. * * * A voluntary payment, within the meaning of the rule that such a payment cannot be recovered, means a payment made by a person of his own motion, without compulsion; a payment made without a mistake of fact or fraud, duress, coercion, or extortion, on a demand which is not enforceable against the payor, instead of invoking any remedy or defense which the law affords against such demand; and whether in a given case a payment is voluntary depends on the facts of the particular case, as indicating an intention on the part of the payor to waive his legal rights. A voluntary payment implies a legitimate cause; and, in the absence of compulsion it includes a payment made on an illegal claim or demand with knowledge of its illegality or groundlessness.'* . . ."* (Emphasis supplied.)

■ If the payor cannot recover from the payee a payment voluntarily made, it follows that his prospects will not be improved by his seeking recovery against a third person who may or may not be liable to the payee.

Since, in the matter before this court, the payment was made for a harm that was not covered by the policy, the necessary element of compulsion is absent.

### Persons Acting in Self-Protection (Not a Volunteer)

■ Within the ambit of legal-subrogation law, it is recognized that one is not a volunteer where it is shown that he made payment to protect his own interest. At 73 Am.Jur.2d, Subrogation, § 25, "Persons acting in self-protection," p. 614, it is said:

"The right of subrogation is not necessarily confined to those who are legally bound to make the payment, but extends as well to persons who pay the debt in self-protection, since they might suffer loss if the obligation is not discharged. A person who has an interest to protect by making the payment is not regarded as a volunteer. In this class are included subsequent encumbrancers paying off a prior encumbrance, though only when they do so to protect their own interest. The extent or quantity of the subrogee's interest which is in jeopardy is not material. If he had any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could. This principle is not limited to payments made to prevent loss of the property, but extends to cases where

the payor or his property is obligated and the creditor has the right to pursue him or the property. And the payment does not need to be made because of a present pressure by the creditor or present danger of loss. It would seem that one acting in good faith in making his payment, and under a reasonable belief that it is necessary to his protection, is entitled to subrogation, even though it turns out that he had no interest to protect. Thus, while an insurance company that pays a loss for which it is not liable has been held a mere volunteer, not entitled to subrogation, an insurer who acts in good faith to discharge a disputed obligation does not become a mere volunteer if it is ultimately determined that its policy did not apply."

In *Wyoming Building & Loan Ass'n, supra*, fn. 2, we held that one was not a volunteer who, in good faith and under the reasonable belief that it is necessary for his protection, paid prior liens, including taxes, even though there was in fact no necessity for payment. We said in this case:

"The only remaining question, accordingly, is whether plaintiff in error may be said to have paid the taxes for the protection of its lien, or whether it should, under the circumstances, be said to have been a mere volunteer and intermeddler who had no right to undertake to pay them. And it is argued that the property could not have been sold for taxes under the laws of this state until the month of June, 1927, and that hence there was no necessity for plaintiff in error to pay them. It is apparent in this case that plaintiff in error did not mean to be a volunteer, but that it in good faith believed that the payment of the taxes was necessary to protect its lien. Pomeroy, Eq.Jur. (2d Ed.) § 2346, in discussing subrogation for one who pays a debt in self-protection, says:

"'It would seem here, as in the first class of cases, that one acting in good faith in making his payment, and under a reasonable belief that it is necessary for his protection, is entitled to subrogation, even though it turns out that he had no interest to protect.'

"A number of cases are cited. See, also, 37 Cyc. 445; *Hankins v. Minchew* (Tex.Com.App.) 285 S.W. 264; *Phelan v. Kennedy*, 103 Misc.Rep. 441, 171 N.Y.S. 410; Id., 185 App.Div. 749, 173 N.Y.S. 687. It is apparent from these authorities that the necessity for self-protection need not be absolute. 25 R.C.L. 1347, in speaking of the payment by a subsequent lienholder of a prior mortgage, says, it is true, that 'it must appear that the discharged mortgage was due and was about to be enforced against the property.' In *Gipps Brewing Co. v. Wasson*, 193 Ill.App. 158, on the other hand, it is held that the right of subrogation of a lienholder who pays a prior mortgage is not dependent on the fact that he was compelled to pay such prior mortgage for his protection. Harris, on Subrogation, § 13, says that 'the right of subrogation accrues in favor of creditors, where a subsequent creditor pays an incumbrance held by a prior incumbrancer, where benefit may result to one without injury to the other.' And in *Mosier's Appeal*, 56 Pa. 76, 81 (93 Am.Dec. 783), the Chief Justice, speaking for the court, said of the same rule:

"'I regard the doctrine as applicable in all cases, where a payment has been made under a legitimate and fair effort to protect the ascertained interests of the party paying, and when intervening rights are not legally jeopardized or defeated.'

"In *Whitehead v. Knitting Mills*, 194 N.C. 281, 139 S.E. 456, the law is stated thus:

"'It has often been said that the law will not aid a mere volunteer, or one who seeks to become a creditor without right or necessity for so doing.'" 269 P. at 49-50.

This brings us to the question of whether the payment by the insurance company was made in good faith and with the reasonable belief that it was made in order to protect its own interest. At the outset, it is clear that the insurance company, in point of fact, had no interest to protect when it

made the questionable payment because the insured could not have successfully pressed its claim against the company on the policy. The record shows that when the roof collapsed, the adjuster made a judgment call to the effect that—even though the opinion of the experts was that the cause of collapse was inherent or latent defect ("design of this building"), and even though the insurance company had knowledge of and was bound by the knowledge that its policy excluded inherent or latent defect—nevertheless, payment would be made. We glean the excuse for this to be that, even though the cause of damage (inherent or latent defect) was excluded by the policy, the adjuster was fearful that the rest of the building might fall down. If the remainder of the building did collapse, the adjuster knew that the cost of repair or replacement would then be greatly in excess of the cost to repair or replace existing damage. This reasoning led to the conclusion that the insurance company, therefore, had a reasonable self-protectable right at stake and that the claim should be paid. This brings us to the nubbin of the legal-subrogation issue.

The cause of damage was excluded from the policy coverage and, therefore, it does not make any difference how favorable a money settlement the insurance company was able to make with the insured in anticipation of the possibility of further building damage. The company, under an assignment which contains the restrictions of Subrogation Paragraph 2, cannot successfully rely upon the doctrine of legal subrogation to recoup from alleged tortfeasors that which was paid with no interest to protect. In other words—if latent or inherent defect was the cause of damage (which appellant admits) and if this cause was excluded from the policy coverage (which it was)—the insurance company could not avoid becoming a mere volunteer by claiming that it was protecting its interest when it paid a claim it did not owe just because the amount of the claim might conceivably be increased upon the happening of some future event.

Under the American Jurisprudence 2d rule, supra, and the doctrine of the *Wyo-ming Building & Loan Ass'n* case, supra, the appellant cannot successfully urge latent defect as the cause of damage and at the same time rely for its subrogation rights upon a contract that *excludes* inherent or latent defect. Such an appellant, under such contentions, will not be heard to say that it was forced to pay the insured in order to enforce a protectable interest. It had no protectable interest. It did not make the payment under "reasonable belief that it is necessary for its protection." *Wyoming Building & Loan Ass'n*, supra. It did not make payment *"under the policy"* (Subrogation Paragraph 2 language).

In holding as we do, we accept the rules of *Wyoming Building & Loan Ass'n*, supra, and the American Jurisprudence 2d rule, supra, which says:

". . . It would seem that one acting in good faith in making his payment, and *under a reasonable belief* that it is necessary to his protection, is entitled to subrogation, even though it turns out that he had no interest to protect . ." 73 Am.Jur.2d, Subrogation, § 25, p. 615, supra (emphasis supplied),

and the part which holds:

". . . [A]n insurer who acts *in good faith* to discharge a disputed obligation does not become a mere volunteer if it is ultimately determined that its policy did not apply." 73 Am.Jur.2d, Subrogation § 25, p. 615, supra. (Emphasis supplied.)

We dispose of arguments made in this case in reliance upon these rules as follows: Here, the facts of the accident and the provisions of the policy being what they are, it must be held, *as a matter of law*, that the insurance company did not make its payment under a reasonable belief that it owed the insured the money. Furthermore, it cannot be said that the company (at least for purposes of ascertaining the answer to a subrogation question such as this) acted in good faith when it paid the insured.

■ For the reasons stated, the insurance company which relies on the cause of dam-

age to be latent defect—an excluded cause—and which would not have had a cause of action through subrogation against builders and architects if this were not the cause, cannot urge, in order to overcome the volunteer defense, that when it paid the insured it did so under compulsion or that it had a protectable interest under the law of legal or equitable subrogation.

### Conventional (Contractual) Subrogation
### Its Characteristics

At 73 Am.Jur.2d, Subrogation, § 9, "Conventional Subrogation," p. 604, the encyclopedia says:

"Conventional subrogation, as the term implies, *is founded on some understanding or agreement, express or implied, and without which there is no 'convention.' Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . ."* (Emphasis supplied.)

Speaking of the value of the agreement, the text goes on to say in the same section, ". . . the so-called agreement being of value only as showing a situation where the doctrine of subrogation should be applied in order to do justice *and as evidence that the lender was not a volunteer.* . . ." (Emphasis supplied.)

It is said in § 9, at page 605 of the same text:

"The contract right of subrogation is somewhat broader than legal subrogation, for the right is granted irrespective of whether the payment was necessary for the protection of the person seeking subrogation."

How do these concepts apply to the matter here for consideration?

First we must look to see what contract provisions are available. The only one applicable is Subrogation Paragraph 2, supra, which we here requote for easy reference:

"In the event of any payment *under this policy* the Company shall be subrogated to all the insured's right of recovery therefor against any person or organization. . . ."

The question is:

Did the company make a payment *under the policy* within the contemplation of subrogation law or not?

We have seen that the theory of conventional subrogation is utilized for various purposes—one of which is to determine that the party who pays the debt is not a volunteer. 73 Am.Jur.2d, supra, § 8, p. 604. Unless saved by the contract (i. e., the Paragraph 2 Subrogation clause), there is no question but that the insurance company was a mere volunteer since it was neither compelled to pay the claim nor did it have an interest which it was required to protect through payment. Where is the language, then, that gives the company subrogation rights as a stranger to the transaction?

There is no such contractual authority.

A vital difference between legal and conventional subrogation is that in the former there must exist compulsion or the reasonable belief that there is an interest to protect in order to claim right to subrogation, while in the latter there need be only an assignment of interest and the assignee may exercise his right of subrogation under the assignment even though the elements of compulsion or protectable interest are not present. *But there must, in fact, be such an assignment in existence and the assignor (insured) must be possessed of such an assignable interest as will confer rights of subrogation upon the assignee (insurance company).* In other words, the assignable right of subrogation may not be so restricted by its own terms as to prevent the assignee's exercise of it under the applicable facts and circumstances. To say it still another way—in conventional subrogation—the effectiveness of the assignment of subrogation rights is dependent upon its own terms. In this case, the assignor-insured can effectively assign its subrogation rights only if it can be concluded that payment has been made *under the policy.*

As has been set out above—when a company

"pays a loss for which it is not liable [it] thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an agreement therefor." *Couch,* supra, § 61:52.

and at § 61:54, the author says:

"Where the harm for which the insurer has indemnified the insured is not covered by the policy, the making of such payment to the insured is deemed 'voluntary,' and no right of subrogation arises. . . . "

Therefore, the insurance company conferred the benefits upon the insured as a stranger without the required assignment or assignable interest necessary in conventional subrogation. The insurer, therefore, remains a mere volunteer without the right of subrogation.

We conclude by holding that, under the doctrine of legal subrogation the insurance company has no cause of action because it did not pay the insured under compulsion and did not, *as a matter of law,* have a legally protectable interest when payment was made. We further hold that the law of conventional subrogation will not rescue the company from becoming a mere volunteer because its subrogation assignment was limited by the condition that payment must have been made "under the policy." This did not occur in view of the fact that insurance companies will be regarded as mere volunteers where payment has been made for a harm not covered.

Affirmed.

McCLINTOCK, Justice, dissenting.

Because the majority base their opinion upon an assumption that is not supported by the record and because I do not find persuasive the principles set forth in Couch, apparently relied upon by the majority, I must dissent. While I agree with Commercial Union that it was not acting as a volunteer when it paid the claim, I would have decided the case under the doctrine of conventional subrogation, thus eliminating the need to consider the volunteer issue.

After setting forth a cursory recital of the facts, the majority conclude that "acting on an insurance adjuster's report which recognized the cause of collapse in all probability to be from latent or inherent defect, i. e., 'design of this building,' the company settled with the insured City and then brought suit against defendant-appellees, architects and engineers." (610 P.2d at 985, 987.) They then go on to base their decision upon an inaccurate assumption. As therein stated, for purposes of the opinion it was assumed that immediately after collapse appellant's adjuster believed the probable cause to be inherent or latent defect. I find nothing in the record to support this assumption. After being notified of the collapse Commercial Union sent its general adjuster, J. F. Mills, to examine the collapsed roof in an attempt to determine what caused the disaster. In a memorandum dated August 11, 1975 Mr. Mills made the following observations:

"As of this writing, we do not have a definite cause established for this loss.

"This building has been examined by droves of architects, engineers and so-called experts on the construction of this kind of a building. There are a number of theories which have been advanced to cover this incident, but there is not one which we can single out at this point as being the positive, certain cause.

"Probably at this writing the best theory advanced is that by our firm of engineers whom we employed to represent our interests in this case, . . . .. They feel it is likely that a thermal condition was created by the manner of design of this building. * * * "

Mills further states in his memorandum:

"After the engineers made their examination and consulted with all of the other engineers who were called into this matter, including those that did the original structural and design work, *it was concluded that it was impossible to pinpoint the exact cause of this collapse. It may be that we may never be able to establish the precise cause.*

"With this in mind, the writer consulted with our attorney in Cheyenne who has handled our work there for many years and who is well informed and well respected. The conclusion was reached by him and by this writer that in the absence of a specific cause and in the absence of our being able to establish, beyond any question, the exact cause of this loss, we would be in no position to advise the insured and the City of Cheyenne that they had no coverage. *We have specific coverage under the Form # 123 on collapse, and we have implied coverage under the # 101 All Risk cover and the only exclusion which has any bearing in this matter really would be that dealing with latent defect.*

"We, therefore, reached the conclusion, after several days of research into this subject, that we were in no position to reject this claim—that it would be regarded as covered. *If we did reject it, the insured would no doubt press the matter and we would be in no position to defend ourselves.* Therefore, upon the advices of our engineers and our attorney, we advised the insureds that we would proceed with the adjustment of the loss." (Emphasis added.)

Because the insurance adjuster could not establish the specific cause of the collapse of the roof he recommended immediate payment of the insurance claim. In fact, it appears that it was important that reconstruction of the building begin immediately. As Mr. Mills states in his memorandum:

"We were confronted with a potentially dangerous situation here in that the construction of a hyperbolic parabaloid is such that when a section of it goes bad, collapses, etc., and when the edge beams are damaged, the whole structure is in danger of collapse."

Commercial paid $431,674.83 in claims for reconstruction of the terminal. It eventually brought the present action against appellees, claiming negligent design and construction of the building.

Generally, the right of subrogation may arise from the equities of a given situation or from an express contract. It applies in cases where one party pays a debt of another who is primarily liable and which debt in equity should have been paid by that other party. *Wyoming Building & Loan Ass'n v. Mills Const. Co.*, 38 Wyo. 515, 269 P. 45 (1928); *Commercial Standard Ins. Co. v. American Employers Ins. Co.*, 6 Cir., 209 F.2d 60 (1954). Subrogation is used to "serve the interests of essential justice between the parties"; "to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it." *Standard Acc. Ins. Co. v. Pellecchia*, 15 N.J. 162, 104 A.2d 288, 292 (1954). It "has come to be one of the great principles of equity of our jurisprudence, and courts incline to extend it rather than restrict it." *Wyoming Building & Loan Ass'n*, supra, 38 Wyo. at 524, 269 P. at 48.

As discussed by the majority, there are two kinds of subrogation: (1) legal or equitable, and (2) conventional. Legal or equitable subrogation is an equitable doctrine that applies as an operation of law. It has been defined in the following way:

"In equity, a court may give restitution to a plaintiff to prevent the unjust enrichment of the defendant, where the plaintiff has used his property in discharging an obligation owed by the defendant, by creating in the plaintiff rights similar to those which the obligee had before the obligation was discharged. * * * If a person has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could. * * Payment of the debt of another under a moral obligation will support equitable subrogation; and the remedy will be applied in all cases where demanded by the dictates of equity, good conscience, and public policy. * * * " *Commercial Standard Ins. Co. v. American Employers Ins. Co.*, 209 F.2d at 64.

If the party making the payment does not have a palpable interest in extinguishing the debt, or a moral obligation to do so, the party discharging the debt will be labeled a

volunteer, and will not be entitled to legal or equitable subrogation. Id., 209 F.2d at 64.

After considering the doctrine of legal or equitable subrogation the majority erroneously determine that Commercial Union acted as a volunteer "as a matter of law" and therefore is not entitled to recoup the payment it made on the claim. In arriving at this conclusion the majority purport to follow the rule of law set forth in *Wyoming Building & Loan Ass'n v. Mills Const. Co.,* supra, and Am.Jur.2d, that "an insurer who acts *in good faith* to discharge a disputed obligation does not become a mere volunteer if it is ultimately determined that its policy did not apply." (Emphasis added.) 73 Am.Jur.2d, Subrogation, § 25, p. 615. However, I do not believe that these authorities support the conclusion reached by the majority.

In *Wyoming Building & Loan Ass'n,* which the majority unsuccessfully attempt to distinguish, this court held that a person is not a volunteer even though it is later determined that payment was made in error. That case involved a situation where the question presented was whether the plaintiff was entitled to subrogation as against subsequent encumbrances during the foreclosure suit. We disposed of the question in the following manner (269 P. at 49):

> "The only remaining question, accordingly, is whether plaintiff in error may be said to have paid the taxes for the protection of its lien, or whether it should, under the circumstances, be said to have been a mere volunteer and intermeddler who had no right to undertake to pay them. And it is argued that the property could not have been sold for taxes under the laws of this state until the month of June, 1927, and that hence there was no necessity for plaintiff in error to pay them. It is apparent in this case that plaintiff in error did not mean to be a volunteer, but that it in good faith believed that the payment of the taxes was necessary to protect its lien."

In determining whether the association acted as a volunteer or in good faith to protect its own interest, this court considered the facts as they existed when the payment was made. At the time it made the payment the association felt that the payment was necessary to prevent foreclosure of the tax lien. And even though the property could not have actually been sold for taxes at the time the payment was made, this court found that the association was not acting as a mere volunteer.

In discussing whether Commercial Union had an interest to protect when it made the payment, the majority state:

> "At the outset, it is clear that the insurance company, in point of fact, had no interest to protect when it made the questionable payment because the insured could not have successfully presented its claim against the company on the policy." (610 P.2d at 990, 991.)

They go on to conclude,

> ". . . *as a matter of law,* that the insurance company did not make its payment under a reasonable belief that it owed the insured the money. Furthermore, it cannot be said that the company (at least for purposes of ascertaining the answer to a subrogation question such as this) acted in good faith when it paid the insured. (610 P.2d at 991.)

However, the same can be said of the plaintiff in *Wyoming Building & Loan Ass'n.* We there concluded that even though plaintiff acted in error it was doing so to protect a self interest. Both Wyoming Loan Ass'n and Commercial Union made payments to protect a self interest and I therefore find the cases indistinguishable.

Because the record reflects that at the time the payment was made it was made in good faith under a reasonable belief that the loss was covered by the policy, I believe that the majority is actually relying upon the principle announced in Couch. Couch states that

> "[w]here the harm for which the insurer has indemnified the insured is not covered by the policy, the making of such payment to the insured is deemed 'volun-

tary,' and no right of subrogation arises."
16 Couch on Insurance 2d § 61:54, p. 271.
Only under this rule can it be said that as a matter of law an insurance company that makes a payment in good faith is held to be a volunteer if after the payment is made a court determines that the loss was not covered by the policy. Wyoming case law precludes not only such a finding as a matter of law, but also the result reached by the majority in the case at bar.

My own careful search has revealed the rule announced in Couch to be sustained by only a few cases, all of which have been cited in the majority opinion. One such case is *Greenville Shipbuilding Corp. v. Hartford Acc. & Ind. Co.*, D.C.N.D.Miss., 334 F.Supp. 1228 (1971), aff'd without opinion, 5 Cir., 460 F.2d 1063 (1972), which is quoted with approval in the majority opinion. In that case an action was brought by one insurance company, Kausler, against another insurance company, Hartford, for reimbursement of the expenses incurred in handling and settling a wrongful-death claim brought against the insured. Both Kausler and Hartford had issued insurance policies insuring Greenville Shipbuilding Corp. against loss. In denying Kausler's claim, the court held that because Kausler's insurance policy did not provide coverage for wrongful-death claims Kausler was acting as a mere volunteer when it settled the claim. Therefore, even though the payment was made in settlement of a claim asserted under a policy of insurance issued by Kausler and which contained the usual subrogation clause, and even though Hartford's policy provided coverage for the loss, Kausler was not entitled to subrogation. In discussing its decision the court stated (334 F.Supp. at 1237–1238):

"It is recognized that this decision works a hardship on Kausler. The court, however, cannot extend aid to one who has made a voluntary payment for which it was not legally liable. Kausler was under the duty to avail itself of the means the law affords and resist the demand. When Kausler undertook to settle the claim for which Hartford was primarily liable, and against which its policy provided ample coverage, Kausler acted as a volunteer and cannot recover on the theory of indemnity from Hartford."

While some courts require an insurance company to litigate the question of whether a questionable loss is caused by the policy, others do not. *Western Casualty & Surety Co. v. Milwaukee General Const. Co.*, 213 Wis. 302, 251 N.W. 491, 492 (1933) is pertinent:

"One confronted with an obligation that he cannot legally resist is not obliged to wait to be sued and to lose a reasonable opportunity to make a favorable compromise in order to avoid assuming the character of an interloper or volunteer in the matter of paying a liability common to him and another."

In determining the merits of Commercial Union's position we do not look at the situation as it existed some months later, or at the time of the hearing upon the motion for summary judgment. Commercial Union was presented with a claim for substantial damages; there was the possibility that if something was not done promptly more damages would occur; in the opinion of its experts, while it was probable that the collapse had been due to a latent defect, there was no firm evidence to that effect and it was therefore a considered judgment that the claim should be paid. That settlement imposed no hardship upon the defendants. They would have been responsible in a suit by the city; their burden is not enhanced by the mere fact that an insurance company has paid the city's claim and now asserts subrogation. I therefore believe that by adopting the rule cited by Couch and relied upon in Greenville this court is punishing Commercial Union for making a good-faith settlement of a claim, without any good reason for such denial. In addition to the present case, adoption of such rule will have far-reaching ramifications. If there is any question that an insurance policy covers a claim, the insured will be forced to institute a lawsuit in order to establish that the claim was covered by the policy. It seems

elemental to me that it is in the public interest to have insurance companies pay claims even though there may be a question of coverage, thus avoiding costly and time-consuming litigation for the insured. After making payment the insurance company is then free to assert the right to subrogation against the party it feels is liable for the loss. Such a holding would prevent a Greenville result, which even that court recognized as imposing a hardship.

While I conclude that Commercial Union is entitled to recover under the doctrine of legal or equitable subrogation, I would have decided the case under the doctrine of conventional subrogation, thus eliminating the need even to address the volunteer rule. Conventional subrogation arises from an implied or expressed contractual right and is not dependent upon a finding that the party extinguishing the debt did not act as a volunteer when it made the payment. *Commercial Standard Ins. Co.*, 209 F.2d at 66. In the case at bar the insurance policy contains this clause specifically providing subrogation to all of the insured's rights in the event of payment:

> "E. SUBROGATION: In the event of *any payment under this policy*, the Company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights." (Emphasis added.)

The majority reject the applicability of this clause of the insurance contract on the basis that there was no payment "under the terms of the policy." It is said that the policy did not cover loss due to latent defect; that Commercial Union knew that the cause of the collapse was such latent defect; and therefore there was no liability under the policy. If there was no liability there could be no payment under the policy. In other words, as I construe the opinion, un-

less and until it had been legally established that the insurance company was liable to the city, any payment by it to its insured was merely out of the kindness of its corporate heart. To put it another way, an insurance company, before making settlement with its insured concerning a claim where third-party responsibility may exist, and wanting to retain its rights of subrogation, must at its peril determine that it has no valid defense which can be successfully asserted against the claim of its insured. Should it subsequently be developed that such a defense existed, all rights that it thought it was acquiring by reason of the subrogation clause in the policy will be held for naught. I confess that I find it both intellectually and emotionally difficult if not impossible to accept such a conclusion.

Whether subrogation is legal or conventional, the purpose is to assure payment of a debt by one who is primarily responsible and which debt in equity should be paid by another party. Its purpose is not to provide immunity to third parties against whom the insured may have a claim. The clause before us provides that upon *any* payment under the policy the insured should have all of the rights of the insured as against third parties. Here there had been a loss, the cause of which was uncertain. The city submitted a claim to the company, which claim could be maintained only under the terms of the insurance contract. The insured, although having some dubiety whether the cause of the collapse might have been a latent defect, had been advised by its engineers and lawyers that at that time it really had no viable defense against the claim. Its claims adjuster, after full investigation of the disaster, and after weighing the pros and cons of the company's contractual and moral responsibilities, as well as the practical difficulties and expense to be encountered in the defense of the city's claim, recommended that it be paid. The claim was paid and I think that it was a payment in discharge of a claimed contractual liability and therefore a payment under the policy.

We are not advised as to whether a formal assignment of all the city's rights was executed and delivered at the time of the settlement, but I do not think that that is important. A claim was made under the policy; payment was made of that claim. The policy itself contains a subrogation of any claims of the insured and that is sufficient to permit maintenance of the suit by the city. I do not deny that there are authorities where the courts have held that in the absence of legal liability on the part of the insurer to its insured there is no subrogation. However, I believe there are other cases where the matter is more carefully considered and I prefer to follow the lead of those cases.

*Commercial Standard Ins. Co. v. American Employers Ins. Co.,* supra, a leading case that reflects the position I would have adopted in the case at bar, discusses the doctrine of conventional subrogation at length. In that case two insurance companies insured Dodd, who was doing business as Dodd Trucking Service, against the same risk. The policy issued by Commercial Standard insured against liability for injuries that arose out of the maintenance of Dodd's truck. American Employers issued two policies for Dodd, insuring him against liability for accidental injuries that arose out of the use of the service station and all operations carried on at the service station. A Mr. Ramey was injured at Dodd's service station when a metal rim from the tire of Dodd's truck flew off and struck Ramey in the head. At the time the accident occurred an employee of Dodd's was removing the wheels from the truck. Ramey brought suit against Dodd for the injuries that he sustained. While the policies issued by both companies covered the loss, American Employers refused to defend the suit or to take any responsibility in payment of the judgment entered against Dodd. Commercial Standard defended Dodd and paid the judgment. Commercial then brought this action against American Employers to recover from them a pro rata share of the costs and payment of the judgment.

American Employers contended that each company was only liable for a pro rata share, and because Commercial Standard ". . . was not legally bound to pay more than its proportion, and was not liable for any share of its co-insurer." Commercial Standard acted as a volunteer when it paid American Employer's share. 209 F.2d at 64. The district court entered judgment in keeping with that theory. However, the court of appeals reversed, finding that the subrogation clause in the policy issued by Commercial Standard was controlling, and that the volunteer rule is not available when one seeks recovery under the doctrine of conventional subrogation. It is important to note that the subrogation clause is identical to the one in the case at bar.

The court discusses the principles of legal or equitable subrogation and the circumstances under which it can be effected. However, consideration of the case on that basis was said to present many interesting but unnecessary questions.

"In the instant case, we are not concerned with legal or equitable subrogation, but with conventional subrogation, which arises from the express insurance contract entered into between the insured, Dodd, and appellant insurer, Commercial Standard Insurance Company. Conventional subrogation, as has been said, is based upon contract—in this case, upon a written contract. * * *

"* * *

"The doctrine of subrogation is applied where money is advanced to pay a debt under an agreement with the debtor or with the creditor, either express or implied, that he shall be subrogated to the rights of the creditor. *Southern Exchange Bank v. American Surety Co. of New York*, 284 Ky. 251, 254, 144 S.W.2d 203. In conventional subrogation, the extent of the right is measured by the agreement for subrogation; equity will determine the rights of the parties by the contract, enforce the agreement, and give the second or substituted creditor what he contracted for. *Federal Deposit Ins.*

*Corp. v. Wilhoit*, 297 Ky. 339, 180 S.W.2d 72." Id. at p. 65.

The court then considers two earlier cases, *United States Guarantee Co. v. Liberty Mutual Ins. Co.*, 244 Wis. 317, 12 N.W.2d 59, 150 A.L.R. 632, reh. denied (1943) and *Detroit Auto. Inter-Insurance Exchange v. Detroit Mut. Auto. Ins. Co.*, 337 Mich. 50, 59 N.W.2d 80 (1953), observing that while the courts had there referred to wrongful conduct of the insurance companies which had refused to perform their obligations, and discussed the rule that payments made to protect an interest were not voluntary, nevertheless

". . . the decisions of those courts were based upon the express contract for subrogation, and are authority for the rule that one who pays the debt of another pursuant to an agreement for subrogation, is entitled to the remedy of subrogation. *Whether the payment of the debt of another is for the purpose of protecting an interest of the one who pays the debt; whether it is paid because of a moral obligation; whether it is a payment by a volunteer—all of these considerations are irrelevant in a case of conventional subrogation.* All of the contentions of appellee American Employers Insurance Company on the subject of subrogation in its arguments and brief in which it cites numerous authorities, are addressed to the proposition that appellant is not entitled to legal or equitable subrogation. None of the arguments or authorities cited bears upon conventional subrogation or upon appellant's rights thereto.

"In this case, the evidence establishes appellant's right to conventional subrogation. There is no mere implication or uncertainty about the terms of such subrogation. It is provided for in the policy of insurance where Dodd expressly agreed, as one of the conditions of appellant's insuring him, that in the event of any payment made by appellant under the policy, Commercial Standard should be subrogated to all Dodd's rights of recovery therefor against any person or organization, and that the insured would execute and deliver instruments and papers and do whatever else was necessary to secure such rights." (Emphasis added.) Id. at p. 66.

Commercial Standard Ins. Co. has been cited in a number of instances. One of these is *United States Fidelity & Guaranty Co. v. Slifkin*, D.C.N.D.Ala., 200 F.Supp. 563, 569 (1961). Defendant, a diamond merchant, received diamonds on consignment accompanied by a memorandum which stated that risk of the diamonds from all hazards with or without negligence was the consignee's. Consignee was robbed. Consignors were compensated for the loss by their insurance carriers, who took "loan receipts," repayable only to the extent of any net recovery by the consignors from Slifkin. In litigation to determine the rights of the various parties the consignors' insurance carriers claimed that they were subrogated to the consignors' rights under the contract where the merchant agreed to be liable.

Defendant argued that the insurance companies acted as volunteers in making the payment to the consignors because under the insurance policies the consignors' insurers were not fully liable for the loss. The court held that the defense was not applicable because the insurance policies provided for conventional subrogation, quoting at length from *Commercial Standard.*

As pointed out in this last-cited case *Commercial Standard* was also cited and followed in two other "other insurance" cases, *Southwestern Indemnity Company v. National Surety Corporation*, 5 Cir., 277 F.2d 545 (1960), and *Liberty Mutual Insurance Company v. Standard Accident Insurance Company*, D.C.S.D.N.Y., 164 F.Supp. 261 (1958), both of which involved subrogation clauses much like that in the case at bar. Also see, *Hartford Fire Insurance Company v. Western Fire Insurance Company*, 226 Kan. 197, 597 P.2d 622 (1979).

Another case which I believe is directly in point on the question of subrogation under an agreement where the insurance company has made a settlement of a claim later determined to be groundless is *Iowa State Ins. Co. v. Missouri Southern R. Co.*, 223 Mo.App. 148, 9 S.W.2d 255 (1928). In that case the insurance company had settled with its insured concerning fire damage to a house owned by the insured. It then sued the railroad whose negligence was claimed to have caused the fire. The policy provided that if the building was or should become vacant or unoccupied for ten days the policy should be void. The Missouri court assumed that the evidence showed such vacancy. The insurance company had taken an assignment of the building owner's right to sue. The defense was made that the insurance company was under no obligation to pay the claim because the policy had become void by reason of the vacancy and therefore the company was a mere volunteer. The court said (9 S.W.2d at 256):

"* * * In this case plaintiff life insurance company paid a claim in regard to which it may or may not have been liable under the policy. At the very time and in consideration of the payment made it took a written assignment from the insured. *Such assignment was provided for by the very terms of the policy.* Plaintiff is in no sense a volunteer. It had an interest in getting settled the claim of the insured arising from the fire loss. It may have preferred to compromise the claim rather than suffer a lawsuit and depend on the theory that the policy of the insured was rendered void by nonoccupancy. Plaintiff was under no obligation to defendant, and should not be compelled to resist a claim in order to save defendant harmless. * * * Moreover, if defendant were liable in the first instance for the fire damage, it should not be relieved of liability on account of the conduct of the plaintiff in paying the claim. When plaintiff paid the fire claim, it became subrogated to the rights of the insured against defendant, and had recourse against defendant *either by sub-*

*rogation or under the written assignment, it makes no difference which.*" (Emphasis added.)

In *Dallas Gas Co. v. Bankers' & Shippers' Ins. Co.*, Tex.App., 53 S.W.2d 130, 131, reh. denied (1932), where the insurance company had settled a claim with its insured that may have had doubtful validity, the court observed:

"Maxey [the insured] presented his claims, and asserted that the loss came within the terms of the policies. The insurers paid the claims. Maxey, by accepting payment, impliedly agreed that the claims came within the terms of the policies, and that they were claims to which the insurance companies became subrogated upon payment thereof. This was a matter that they had the right to settle among themselves, and it is no concern to the wrongdoer who caused the loss that the insurance companies paid a loss which they could have defeated in court."

I am in complete agreement with the courts that have held that an insurance company has no obligation to resist a claim in order to be entitled to assert the right of subrogation against a third party who may be liable for the loss. I therefore reject the principle announced by Couch relied upon by the majority. The opinion handed down today restricts rather than extends a doctrine that has been called by this court "one of the great principles of equity of our jurisprudence." *Wyoming Building & Loan Ass'n*, 269 P. at 48.