**NORTHERN UTILITIES DIVISION OF K N ENERGY, INC., a Kansas corporation, Appellant (Plaintiffs),**

v.

**The TOWN OF EVANSVILLE, Wyoming, a municipal corporation; Central Contractors Co., Inc., a Wyoming corporation; and John Does II and IV, Appellees (Defendants).**

**No. 89–30.**

Supreme Court of Wyoming.

Dec. 10, 1991.

Jeffrey C. Brinkerhoff and C. John Cotton, Brown & Drew, Casper, for appellant.

Cameron S. Walker and Judith A. Studer, of Schwartz, Bon, McCrary & Walker, and Robert Jerry Hand, Hand & Hand, P.C., Casper, for appellees.

Before CARDINE, C.J.*, THOMAS, URBIGKIT and GOLDEN, JJ., and ROONEY, J., Retired.

URBIGKIT, Chief Justice.

This appeal presents tort damage derived claims for contribution, indemnity, and subrogation. At issue is the public gas utility's status as a joint tort-feasor, its extent of potential liability, and whether it made a settlement payment as a volunteer after a consumer's house was blown up in a natural gas explosion. A parallel but separate issue examines whether an amendment to the complaint under the fictitious name rule substituting a named defendant for a "John Doe" defendant effectively relates back to the date of the original complaint after expiration of the statute of limitations.

Summary judgment in favor of Central Contractors Company, Inc. is affirmed on the basis of statute of limitations expiration, and the summary judgment in favor of The Town of Evansville, Wyoming on the issues of contribution, legal subrogation, conventional subrogation, and indemnity is reversed.

* Chief Justice at time of oral argument.

## I. ISSUES

The public gas utility, Northern Utilities Division of K N Energy, Inc. (NUD), sued the franchisor, The Town of Evansville, Wyoming (Town), and the utility work contractor, Central Contractors Company, Inc. (Central). NUD's litigation effort was ended by an adverse summary judgment on all claims by which it attempted to recoup its $90,000 property damage and bodily injury settlement payment. An Evansville, Wyoming home was destroyed in a natural gas explosion and the owner, Agnes Ferron, suffered significant physical injury from being present in the house where natural gas had collected and then exploded. NUD settled the homeowner's property damage and physical injury claim for $90,000 and then sought contribution and subrogation from the Town and Central and indemnity from the Town.

By this appeal, NUD asserts that genuine issues of material fact exist regarding its status as a tort-feasor, and its liability to Ferron precludes summary judgment. In addition, Central contended that the cause of action against it on the contribution theory was barred by the statute of limitations, an issue not addressed by the trial court because of its decision that NUD was a volunteer.

NUD states the issues as follows:

A. Did the District Court Err As a Matter of Law in Granting Summary Judgment on Plaintiff's Claims Against Defendants for Contribution?

B. Did the District Court Err As a Matter of Law in Granting Summary Judgment on Plaintiff's Claims Against Defendants for Legal or Equitable Subrogation?

C. Did the District Court Err As a Matter of Law in Granting Summary Judgment on Plaintiff's Claims Against Defendants for Conventional Subrogation?

D. Did the District Court Err As a Matter of Law in Granting Summary Judgment on Plaintiff's Claims Against Defendant Town of Evansville for Indemnity?

The determinations by the trial court which are central to this appeal addressed first, the volunteer status of NUD in its gas explosion damage settlement and payment, and second, whether that payment was subject to an assignment sufficient to sustain subrogation recoupment.

## II. FACTS

This litigation results from a February 13, 1985 public utility supplied natural gas explosion at the residence of Agnes Ferron, located at 1080 Oildale Street, Evansville, Wyoming, which destroyed both the home and her personal belongings. Not only was the property damage near complete, but the owner who was at home was injured and suffered a permanent hearing injury and reoccurring nightmares. Her litigative posture for damage recovery was overtly favorable.[1]

Following the explosion, the public utility excavated its gas line in the street to investigate the accident and discovered a gas leak coming from damage to its gas main at the intersection of Oildale Street and Gold Avenue. It was concluded the leaking gas had followed the house access line into the home where it collected before the explosion. NUD also established, at least to its satisfaction, that the damage to the gas main was caused by the action of one or more third-party utility contractors during their construction work on the Town's water system. In April 1979, a crew employed by the Town had excavated and

---

**1.** Ferron lost her home and apparently all of her furniture and personal possessions, including clothing items. The record does not differentiate between the home and tangible personal property items, including furniture and the physical injury sustained, but no one suggests that the pursuit of negotiations from a short fused $150,000 initial demand to a $90,000 settlement was overly generous or exceptionally gracious. Undoubtedly, a trial would more adequately establish boundaries of litigable exposure, but certainly this settlement was within realistic boundaries of potential liability. The settlement payment included three elements in undefined amounts: (1) subrogation claim of Ferron's own home insurance casualty carrier; (2) other uninsured or insurance policy deductible losses; and (3) personal injury.

replaced a water main segment in the vicinity of the intersection of Gold Avenue and Oildale Street. During the same time period, a Central crew under contract with the Town also excavated and installed another segment of the water main and attached a valve in the same vicinity. For purposes of this appeal in its summary judgment context, it is not disputed that either the Town or Central caused the natural gas line damage during city water system repair. Some entity in street excavation had hit and damaged the underground gas line and then did not report the potential danger to the gas utility.

The city utility franchise agreement had expired prior to 1973. Thereafter, NUD, as the public utility, continued to furnish natural gas service to the residents of Evansville by application of "an informal arrangement" with the Town. In conjunction with that informal agreement of practice and arrangement, the Town also followed the practice of repaying resulting costs for repair if damage to the buried lines of the utility occurred during street construction operations.

It was NUD's litigative posture before the trial court and now on appeal that during the time of the informal arrangement, W.S. 37–12–303 (1991) required any person damaging its underground facilities to notify them of the damage. In compliance, the Town's course of operation as a procedure also required utility service notification of any damage to the gas facilities, even if caused by hand tools. It is clearly shown in this record that neither the Town nor Central, as the excavating contractor, had ever contacted NUD regarding damage to NUD's gas main during the 1979 excavation.

During the period of these events, NUD conducted inspections to repair its natural gas system, but never discovered any damage to the gas main in the Oildale Street and Gold Avenue intersection. At some time prior to February 13, 1985, NUD had however received complaints of a gas odor at Ferron's home, but had not been able to identify the location of any gas leak and no corrective action was taken.

In June 1985, counsel for Ferron and her insurance carrier, State Farm Fire & Casualty Company, made a written pre-suit demand on NUD for $150,000 for the destruction of Ferron's home, her personal property, and personal injuries suffered as a result of the explosion and fire. That correspondence was followed by a letter of November 11, 1985, through which NUD advised the Town of its contention about liability and consequent obligation to settle the claims being submitted by Ferron for her personal injury and property damage. A defense was tendered to the Town by the letter which also discussed a proposed settlement with the injured homeowner in the sum of $90,000 and further stated that "[i]f you choose not to accept the defense, then we will assume that you agree * * * that the settlement proposal is reasonable."

Evansville declined the tendered defense or involvement in settlement negotiations. Its employees also refused to provide NUD with information concerning construction activities in the street intersection which may have caused the gas line damage. On February 1, 1986, NUD settled with Ferron for the $90,000 sum and followed somewhat later with a supplemental notice of claim seeking contribution and indemnity from the Town in that amount. On November 3, 1986, NUD filed its original complaint naming as defendants the Town and John Does I through IV, seeking indemnity and contribution. The Town first answered the complaint on November 24, 1986 and then filed variant motions for summary judgment in the succeeding litigative period.

Following the filing of factual material and briefing by the parties on the issues of contribution and indemnity, the trial court filed a summary judgment decision letter ruling on July 2, 1987 in favor of the Town on the issue of contribution, but denying the Town's summary judgment motion on the issue of indemnification. Partial summary judgment was consequently granted to the Town on the contribution claim only. NUD amended its original complaint to plead with more specificity allegations concerning indemnity and to include claims for

breach of statutory duty, equitable subrogation, conventional subrogation, and negligence, specifically adding a line damage claim of $6,540.10. A further third amended complaint substituted Central for the entity previously identified as John Doe I.

In 1988 pleadings, Evansville again filed a motion to dismiss and/or for summary judgment and Central filed similar motions with its answer and affirmative defenses. The trial court filed a decision letter granting the Town's and Central's motions for summary judgment followed by the entry of the general order of summary judgment favoring both defendants on all claims. Appeal is taken from that summary judgment which denied the property settlement recovery claims based on contribution, indemnity, legal subrogation and conventional subrogation. There was no appeal from the summary judgment granted to the Town on the $6,540.10 line damage claim which had been determined by the trial court on improper claim filing and statute of limitation concepts.

### III. TOWN OF EVANSVILLE RECOVERY ISSUES

#### A. Contribution

■ NUD argues the trial court erred in granting summary judgment in favor of the Town on the issue of contribution. 18 Am.Jur.2d *Contribution* § 1 (1985) (footnotes omitted) defines contribution:

> Contribution has been defined as a payment made by each person, or by any of several persons, having a common interest or liability, of his share in the loss suffered or in the money necessarily paid by one of the parties in behalf of the others. The right of contribution has also been variously described as the right of one who has discharged a common liability or burden, to recover of another,

also liable, the portion which he ought to pay or bear * * *.

The right of contribution is dependent upon the existence of a statute and involves joint tortfeasors. *Richardson Associates v. Lincoln–DeVore, Inc.*, 806 P.2d 790 (Wyo. 1991); Comment, *Wyoming Contribution Among Joint Tortfeasors*, IX Land & Water L.Rev. 589 (1974).

NUD's right to contribution pursuant to the former statutes, W.S. 1–1–110 through 1–1–113 (1977),[2] rests upon the question of whether NUD and the Town are joint tortfeasors. *Garner v. Hickman*, 709 P.2d 407 (Wyo.1985). In concluding that NUD was not entitled to contribution, the trial court cited *Garner; Commercial Union Ins. Co. v. Postin*, 610 P.2d 984 (Wyo.1980); and 70 C.J.S. *Payment* § 100 (1987). *Postin* involves the issue of voluntary payment in the context of legal or equitable subrogation and will be discussed later.

*Garner* discusses contribution pursuant to the former statutes, W.S. 1–1–110 through 1–1–113, and, quoting Black's Law Dictionary 752–53 (5th ed.1979), defines "joint tortfeasors" as follows:

> "*Joint tort-feasors* * * * refers to two or more persons jointly or severally liable in tort for the same injury to person or property. * * * Those persons who have acted in concert in their tortious conduct and are, accordingly, jointly and severally liable. Those who act together in committing wrong, or whose acts if independent of each other, unite in causing single injury. * * *"

*Garner*, 709 P.2d at 413.

Thus, NUD is entitled to make a claim for contribution from the Town if they were joint tort-feasors. The trial court found that there was no allegation of joint liability made by either party. If this finding is supported by the record, the trial

---

**2.** The former statute, W.S. 1–1–110, provides in pertinent part:

(a) Except as otherwise provided in W.S. 1–1–110 through 1–1–113, where two (2) or more persons become jointly or severally liable in tort for the same injury to person or property * * * there is a right of contribution among them even though judgment has not been recovered against all or any of them.

(b) The right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share. No tortfeasor is compelled to make contribution beyond his own pro rata share of the entire liability.

court correctly concluded that contribution was not applicable here, as contribution cannot exist if the injury was the result of the negligence of the Town *or* the negligence of NUD, and not a mixture of the two. *Garner,* 709 P.2d 407; *Rees v. Dallas County,* 372 N.W.2d 503 (Iowa 1985); Prosser & Keeton, *The Law of Torts,* § 50 at 339 (5th ed.1984). However, if the record demonstrates that genuine issues of material fact exist as to whether NUD was a joint tort-feasor, summary judgment on the issue of contribution was inappropriate and should be reversed. *Baldwin v. Dube,* 751 P.2d 388 (Wyo.1988); *Cordova v. Gosar,* 719 P.2d 625 (Wyo.1986); *Greaser v. Williams,* 703 P.2d 327 (Wyo.1985); *National Farmers Union Property & Cas. Co. v. Nelson,* 260 Iowa 163, 147 N.W.2d 839 (1967).

■ The documents before the trial court at the time of the July 2, 1987 decision letter included the affidavit of Robert F. Hughes (General Superintendent–Distribution for NUD) and NUD's answers to the Town's first discovery request. The affidavit of Hughes sets forth the undisputed fact that the explosion was caused by leakage of natural gas from a damaged section of NUD's natural gas distribution main. The affidavit also sets forth the facts, undisputed for purposes of this appeal, that the damage to NUD's line was caused by construction of the Town's water system, and that Ferron was determined by NUD to be without fault in the occurrence. The affidavit further recounts the demand made on behalf of Ferron against NUD, and NUD's unsuccessful attempts to tender the defense of Ferron's claims against the Town.

Hughes states in his affidavit as follows: Recognizing the risk of exposure to NUD and the difficulties of defending any gas explosion case, particularly a case involving an innocent party, NUD chose to settle with Ms. Ferron, reserving the right to proceed against parties proximately causing the above-mentioned incident.

NUD's risk of exposure is demonstrated by its answers to the first discovery of the Town. Its answers indicate that in addition to repairs and maintenance, NUD performed regular inspections of the main, service pipes, connections and valves in the area of the damaged and leaking gas line during the time period between April 1979 and the date of the explosion on February 13, 1985. The specific question to be answered concerning the liability or non-liability of NUD is whether it should have discovered the damaged gas line and leak in question prior to the explosion. A review of those documents, from a viewpoint most favorable to NUD and giving to it all favorable inferences to be drawn from the facts therein, demonstrates the existence of genuine issues of material fact regarding the liability or non-liability of NUD. *Hyatt v. Big Horn School Dist. No. 4,* 636 P.2d 525 (Wyo.1981); *Bancroft v. Jagusch,* 611 P.2d 819 (Wyo.1980). The Wyoming rule for granting summary judgment establishing proponent's burden to demonstrate an absence of factual issue is well established. *Stephenson v. Pacific Power & Light Co.,* 779 P.2d 1169 (Wyo.1989); *Davenport v. Epperly,* 744 P.2d 1110 (Wyo.1987); *Cordova,* 719 P.2d 625.

As an additional ground for granting summary judgment on the contribution issue, the trial court found that NUD voluntarily made the settlement payment, i.e., payments it was under no legal compulsion to make.[3] The former statutes, W.S. 1–1–110 through 1–1–113, do not require that payment be made under a "legal compulsion" before the provisions of the statute regarding contribution apply. The right to contribution rests upon the question of whether the parties are joint tort-feasors and presents a question of fact for the jury to determine.

Some party or parties participated in the damage to the gas line and subsequent escape of the dangerous substance into Ferron's house. NUD contends it was done by the Town directly or through its contractor when either or both did disruptive street work. Those causative activities

---

**3.** July 2, 1987 decision letter.

were sequentially followed by NUD in its subsequent failure to discover the damaged line and correct the leakage before the resulting explosion occurred. This explosion had a cause and the cause was not an act of God as distinguished from the conduct of man. Some actor, and arguable all three, participated in the explosion that blew up Ferron's home, destroyed her possessions and caused her personal injury. A suitable factual examination at trial can sort out who, what and why. We therefore reverse the trial court's summary judgment on the issue of contribution and remand for determination of whether the parties were joint tort-feasors.

### B. Legal or Equitable Subrogation

■ In its October 26, 1988 decision letter, the trial court correctly concluded that "a volunteer cannot recover on a theory of legal subrogation." In *Postin,* 610 P.2d at 986 (quoting *Criss v. Folger Drilling Company,* 195 Kan. 552, 407 P.2d 497, 500 (1965)), we discussed subrogation as follows:

> Subrogation has been defined as "the substitution of another person in the place of a creditor, so that the person in whose favor it [subrogation] is exercised succeeds to the rights of the creditor in relation to the debt."  * * *

> \*      \*      \*      \*      \*      \*

> There are two kinds of subrogation—legal or equitable and conventional. Legal or equitable subrogation arises by operation of law, and conventional subrogation arises by contract.

*See also Richardson Associates,* 806 P.2d at 811. The principle established in *Postin,* 610 P.2d at 987 was that "it is a defense in legal or equitable subrogation to show that [the party claiming subrogation] paid as a mere volunteer." [4]

After determining that the insurance company in *Postin* had not paid under compulsion, we further noted that a party claiming subrogation is not a volunteer if it acts to protect its own interest. Specifically, we stated as follows:

> Within the ambit of legal-subrogation law, it is recognized that one is not a volunteer where it is shown that he made payment to protect his own interest. At 73 Am.Jur.2d, Subrogation, § 25, "Persons acting in self-protection," p. 614, it is said:

>> "The right of subrogation is not necessarily confined to those who are legally bound to make the payment, but extends as well to persons who pay the debt in self-protection, since they might suffer loss if the obligation is not discharged. A person who has an interest to protect by making the payment is not regarded as a volunteer. * * * The extent or quantity of the subrogee's interest which is in jeopardy is not material. If he had any palpable interest which will be prohibited by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as a creditor could.  * * * It would seem that one acting in good faith in making his payment, and under a reasonable belief that it is necessary to his protection, is entitled to subrogation, even though it turns out that he had no interest to protect."

*Postin,* 610 P.2d at 989–90. *See also Wyoming Building & Loan Ass'n v. Mills Const. Co.,* 38 Wyo. 515, 269 P. 45 (1928).

Volunteer status is a question of law to be determined by the court. *Employers Mut. Fire Ins. Co. v. Piper,* 335 S.W.2d 925 (Ky.1960). However, factual issues must be resolved before the court can decide the legal issue of whether or not a party was a volunteer and not entitled to subrogation. *Id.* at 928. In *Piper,* the insurer paid its insured for damaged machinery under a first-party casualty policy. Following payment, the insurer sought subrogation from a contractor who was moving machinery to

---

4. The legal concepts enunciated in *Postin* were solidly based and well established. The factual conclusion that the insurance company in the case paid as a volunteer is extremely hard to fathom. Excess limits and bad faith insurance cases of current vintage should teach us something about "contendable risk" in either first or third party perspective. *Coulthard v. Cossairt,* 803 P.2d 86 (Wyo.1990); *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855 (Wyo.1990).

a new site under a contract when an explosion damaged the insured machinery. The *Piper* court held that granting summary judgment was erroneous and that factual issues of whether or not the contractor had control of the machinery at the time of the explosion and whether or not the machinery was within 100 feet of the building as required in the policy would have to be resolved before the court could decide the issue of whether or not the insurer was a volunteer and therefore not entitled to subrogation. *See* 16 Couch on Insurance 2d § 61:55 (Rev. ed. 1983). The court in *Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1394 (10th Cir.1987) accurately analyzed:

> The question of voluntariness turns on the facts of each particular case. *Sturdevant v. Mills*, 177 Mont. 137, 138, 580 P.2d 923, 926 (1978) (citing 70 C.J.S. *Payments* § 134 (1951)). There is a presumption, however, that a payment is not made voluntarily. *McGuire v. Wilson*, 372 So.2d 1297, 1302 (Ala.1979) (citing 16 G. Couch, *Cyclopedia of Insurance Law* § 61.54 (1966)).

■ We agree with NUD that genuine issues of material fact exist that must be resolved before the trial court can decide whether or not NUD was a volunteer; specifically, whether NUD's payment was in good faith and under a reasonable belief that payment was necessary. A review of the record demonstrates that NUD had potential liability and monetary exposure in this situation. NUD had conducted regular inspections of the main, service pipes, connections, and valves in the area of the explosion prior to the date of the accident, and had failed to find a leak. In addition, NUD had actually received customer complaints of a gas odor from Ferron, but failed to determine that no leak existed or to locate its existence. Under threat of litigation, and with claims of damages to Ferron in excess of $150,000, NUD settled at the compromised amount.

NUD's investigation following the explosion established that Ferron was not contributorily negligent. Under the rule of joint and several liability which existed at the time, if a jury found that NUD was even one percent negligent for failing to discover the leak, NUD was exposed to the entire amount of any judgment awarded to Ferron.

The record now presented could factually support a determination that NUD's settlement was in good faith and under a reasonable belief that payment was necessary to protect NUD's interests.

In general, subrogation is applied to avoid unjust enrichment when one party, other than a volunteer, has discharged an obligation which should have been satisfied by another. * * * It is a device whereby a court compels the ultimate payment of an obligation by the party who in good conscience ought to pay it. *Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1485 (10th Cir.1991). "Subrogation is an equitable doctrine; and, therefore, equitable principles apply in determining whether subrogation is available." *Remy v. Michael D's Carpet Outlets*, 391 Pa.Super. 436, 571 A.2d 446, 452 (1990).

Within this factual issue addressing NUD's interest at risk, it is certainly not determinable as a matter of law that NUD was a volunteer when it paid the $90,000. We reverse and remand on the issue of legal or equitable subrogation.

## C. Conventional Subrogation

In *Postin*, 610 P.2d at 992, we discussed conventional subrogation and stated:

> At 73 Am.Jur.2d, Subrogation, § 9, "Conventional Subrogation," p. 604, the encyclopedia says:
>
> > "Conventional subrogation, as the term implies, *is founded on some understanding or agreement, express or implied, and without which there is no 'convention.' Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid....*" (Emphasis supplied)
>
> > *       *       *       *       *       *

"The contract right of subrogation is somewhat broader than legal subrogation, for the right is granted irrespective of whether the payment was necessary for the protection of the person seeking subrogation."

The trial court's October 26, 1988 decision letter, citing *Allstate Ins. Co. v. Druke,* 118 Ariz. 301, 576 P.2d 489 (1978) and *Block v. California Physicians' Service,* 244 Cal.App.2d 266, 53 Cal.Rptr. 51 (1966), held that "[t]he prevailing rule * * * appears to be that an assignment of a cause of action for personal injuries is void as against public policy and cannot be the subject of a subrogation claim."

NUD asserts that the trial court was in error in concluding that the claims at issue were not assignable and hence could not be the subject of a subrogation claim. NUD entered into an agreement with Ferron and her insurer, State Farm, the property damage carrier for the destroyed house, (referred to as "Plaintiff") which provided in pertinent part:

[This Agreement] is * * * intended to provide and preserve for Northern full rights of contribution, and Northern is as well subrogated to any rights of Plaintiff, against all other negligent persons, entities and corporation not an executing party to this Agreement including, but not limited to, the Town of Evansville, those contractors employed by the Town of Evansville and all other contractors who struck Northern's gas distribution line in or around the area of Plaintiff's house.

The general rule governing the assignability of causes of action for personal injuries is stated in 6 Am.Jur.2d *Assignments* § 39 (1963) (emphasis added and footnote omitted):

The principal reason for holding that choses in action for personal injuries resulting from negligence or from other tortious acts are not assignable lies in the fact that they do not survive the death of the person injured, and *it is generally held that the enactment of statutes providing for the survival of such actions operates incidentally to remove the restrictions on their assignability. The question of survivorship becomes the test whether an assignee can recover.*

■ W.S. 1–4–101 (1988), entitled "Causes of action that survive", states as follows:

In addition to the causes of action which survive at common law, *causes of action for* mesne profits, *injuries to the person, and injury to real or personal estate,* or any deceit or fraud *also survive.*

(Emphasis added). Thus, in Wyoming, causes of action for damage or injury to persons and property survive and are assignable, and consequently can be the subject of a claim for conventional subrogation. We hold that the trial court was in error in concluding that the claims at issue were not assignable and hence could not be the subject of a subrogation claim. Summary judgment on the issue of conventional subrogation is therefore reversed and remanded. This decision is confined to the subject presented, namely a preclusion against assignment as a legal theory which forecloses any subrogation action by the payor against the contended negligent party. We do not address the broad subject of assignability of personal injury rights of action in any context except the limited scope of conventional subrogation here presented.

In this case, the record reveals three elements included in the $90,000 settlement made by NUD. There was a subrogation interest originally acquired by State Farm in settlement with its insured, Ferron, for damage to the house as a first-party settlement which apparently included the loss of her house and destruction of her furniture, clothes and personal effects. State Farm paid Ferron and filed a subrogation claim against NUD. The further element of the settlement, separate from the initial real property and personal property damage subrogation claims, results from the additional amount paid for the third-party settlement by NUD with Ferron for injury and possible property damage and loss of use not paid by State Farm. This record

by careful intent or apparent disinterest does not demonstrate how the $90,000 payment was allocated between the State Farm subrogation interest and Ferron's liability claim. This subrogation analysis obviously presents both an individual personal injury and a property damage component. The summary judgment argument and appellate briefs relate to the subrogation (assignment of rights) against a tortfeasor resulting from the bodily injury component.

As earlier noted, the logical foundation for non-assignability of personal injury claims resulted from a thesis of non-survivability. That preclusion has been removed in Wyoming by a survival statute. However, survival statute enactment does not in all jurisdictions automatically make the personal injury claim an assignable intangible right whether or not prohibitory or validating assignment statutes exist. Involved and discrete issues develop regarding subjects such as subrogation of first-party medical pay insurance coverages and major tort case syndication by interest assignment. Consequently, with survival statute enactment in Wyoming, we address assignability only as it relates to a subrogation recovery remedy after some character of liability claim payment has been made by the subrogated party.

■ The rule we apply is that non-assignability principles of injury damage claims, if any exist in Wyoming, do not extend to subrogation proceedings. Consequently, neither of the authorities cited by the trial court in its decision are factually applicable. *Druke*, 576 P.2d 489 involved a first-party medical pay coverage subrogation claim. Allstate Insurance Company had attempted to enforce subrogation repayment against its insured from personal injury claim collection from a third-party defendant. On review, the Arizona court followed what may be a general rule and invalidated insurance policy subrogation

provisions for payments made under medical pay automobile insurance policy coverage.

The second case cited, *Block*, 53 Cal. Rptr. 51, is somewhat similar. It addressed a policy provision of a nonprofit medical insurance company requiring policyholders to repay amounts paid under the policy if any third-party recovery on an injury claim was collected from a tort-feasor. The policy provision was *validated* on a premise of denial of double recovery and the court's assertion that it was not assignment or subrogation but only constituted required reimbursement. The non-assignability comment in the opinion was rendered idle dictum in the decision by the intermediate appellate court.[5]

It is recognized that although in the discussion of contribution, "joint tort-feasors" is a term and a characterization normally used; in this factual situation, we have *successive* tortfeasors. *Radford–Shelton Associates Dental Laboratory, Inc. v. Saint Francis Hospital, Inc.*, 569 P.2d 506 (Okl.App.1976). The *Radford–Shelton* court directs us to the three categories of actors within apportionment and contribution litigation proceedings:

> The problem of apportioning damages among tort-feasors becomes clearer when we distinguish between the three kinds of tortfeasors:
>
> *Joint tort-feasors*—those who have acted intentionally or in concert to injure a third party. * * * *Concurrent tort-feasors*—those whose independent, negligent acts combined or concurred at one point in time to injure a third party. * * * *Successive tort-feasors*—those whose independent, negligent acts, although severable in point of time, caused injury to the same third party.

*Id.* at 509.

In this case, the negligence of Central occurred in damaging the gas line and sub-

**5.** An interesting facet of appellate jurisprudence is provided by consideration of these two cases. The background ideology and general discussion are very similar and follow the same contention of non-assignability to achieve an exact opposite result. Additionally in *Druke*, a case is cited, *Decespedes v. Prudence Mut. Cas. Co. of Chicago, Ill.*, 193 So.2d 224 (1966), *aff'd* 202 So.2d 561 (Fla.1967), which does not support the decision in *Druke* and is consistent with the *Block* decision since it held that the settlement with the tortfeasor denied the insured's contractual right to policy benefits for purchased medical expense coverage.

sequent failure to tell NUD that its equipment had hit the buried line. The Town comes into responsibility, if any, from its own construction damage to the line, the conduct of Central or, alternatively, from the failure to supervise or advise of damage or to give notice in advance that the work was to be undertaken. Thereafter in sequence, NUD, as a successor in behavior, incurs liability from the explosion derived from an inspection failure or glitch in non-discovery of the source of the gas after notice of the danger had been provided. Clearly, NUD was, in the definitional terms, sequentially a successive tort-feasor who seeks reimbursement for the harm caused by the independent prior conduct of Central and the Town.

A case with similar facts, except that trial was held, is provided in *Alamida v. Wilson*, 53 Haw. 398, 495 P.2d 585 (1972). A misplaced power pole adjacent to the highway caused an accident with serious physical injury. Plaintiff sued the utility and the County of Hawaii and settled with everyone except the county for $118,000. At trial, the jury found the county to be negligent and held that the settling defendants were entitled to recover from the county under the equitable principle of subrogation. Thus, the decision established the right of the settling defendants to pursue a claim by subrogation against a defendant which did not contribute or settle. A similar reserved right to litigate a settled claim against the tort-feasor was also recognized in *Aetna Cas. & Sur. Co. v. Associates Transports, Inc.*, 512 P.2d 137 (Okl. 1973).

Another subrogation case of similar facts, although with only property damage, is provided in *Rexroad v. Kansas Power & Light Co.*, 192 Kan. 343, 388 P.2d 832 (1964). In *Rexroad,* the contractor was doing street work when its bulldozer struck insufficiently buried gas lines in the street. The bulldozer was burned up as was a neighbor's house. The contractor sued the gas company for its loss and for subrogation for the payments it had made to the neighbor whose lawsuit had taken three trips to the Kansas Supreme Court before finalization and payment.

Immediately after conclusion of the neighbor's suit, the contractor amended its pending negligence action against the gas company for loss of the bulldozer and added the subrogation claim for compensatory payment to the neighbor. The bulldozer aspect was primarily subrogation by a non-named casualty carrier which had paid all but the deductible for the loss of the bulldozer. The jury rendered a verdict for the subrogated claim derived from settlement with the neighbor but not the bulldozer. Rights to maintain both classes of subrogation claims were validated by the Kansas Supreme Court decision.

Settling initial tort-feasor rights against a successor tort-feasor where augmented injury existed was pursued in *Underwriters at Lloyds v. City of Lauderdale Lakes*, 382 So.2d 702 (Fla.1980). The court recognized, which we appropriately apply here:

> Subrogation is an equitable doctrine whereby the initial tortfeasor/defendant is placed "in the shoes" of the plaintiff. * * * It is a legal device "founded on the proposition of doing justice without regard to form, and was designed to afford relief where one is required to pay a legal obligation which ought to have been met, either wholly or partially, by another. *Trueman Fertilizer v. Allison,* Fla., 81 So.2d 734 [1955]."

*Underwriters at Lloyds,* 382 So.2d at 704. *See Hocker,* 922 F.2d 1476. Included in supporting citations were cases involving negligent doctors who aggravated the victims' injuries for which injuries the settling initial tort-feasor sued the doctor on a subrogation basis and succeeded in recovery.

The early injury subrogation case in a worker's compensation fund reimbursement context was *Aetna Life Ins. Co. v. Moses,* 287 U.S. 530, 53 S.Ct. 231, 77 L.Ed. 477 (1933). The United States Supreme Court rejected the common law rule of non-assignability and validated a statutory right of the fund to be subrogated to the rights of the injured worker against the third party which had caused the injury. The court found no difference between an injured survivor or a non-surviving victim.

The compensating employer "acquires the legal rights of the employee or the personal representative * * *," *id.* at 541, 53 S.Ct. at 233, and the insurer was subrogated to the rights of the employer.[6] The subrogation interest concept has an ancient history earlier recognized in *Regan v. New York & N.E.R. Co.*, 60 Conn. 124, 22 A. 503 (1891), which in result is directly contrary to the basic collectability thesis of *Decespedes v. Prudence Mut. Cas. Co. of Chicago, Ill.*, 193 So.2d 224 (1966), *aff'd* 202 So.2d 561 (Fla.1967). Subrogation by a city for wages paid to an injured fireman who sued the third party tort-feasor was likewise approved in *Potoczny to Use of City of Philadelphia v. Vallejo*, 170 Pa.Super. 377, 85 A.2d 675 (1952). That court stated the rule:

"Where property of one person is used in discharging an obligation owed by another * * *, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee. * * *"

To refuse subrogation in the instant case is merely to permit the defendant to get a benefit from the discharge of a duty by the city which, as between him and the city, should have been discharged by him.

*Id.* 85 A.2d at 677 (quoting Restatement, *Restitution*, § 162).

We conclude that concepts of non-assignability of personal injury claims are not applicable in this subrogation case and, consequently, the summary judgment on this issue was improvidently granted. Issues of relative fault charged to NUD, the Town and Central should be determined by trial examination.[7]

*D. Indemnity*

■ In the October 26, 1988 decision letter, the trial court granted the Town summary judgment on the indemnity issue relying upon the trial court's July 2, 1987 finding that NUD was a volunteer. The trial court stated that "it is necessary for the plaintiff to allege and prove that he was legally liable to the person injured and paid under compulsion" in order to avoid summary judgment on the issue of indemnity. NUD argues again that genuine issues of material fact exist with regard to the volunteer status of NUD, and, consequently, summary judgment on the basis that NUD was a "volunteer" was in error. We agree.

This case is postured in a very preliminary stage of factual and legal theory development as the result of the summary judgment decree based upon the trial court's dispositive "volunteer" and non-assignability determinations. Any theory within the confines of indemnity, express, implied (implied in fact) and non-contractual (implied in law) derives generally from the same contractual or implied contractual theories of recovery. *Richardson Associates*, 806 P.2d at 811.

---

6. The one Wyoming case of similar rapport is *Iowa National Mutual Insurance Company v. Huntley*, 78 Wyo. 380, 328 P.2d 569 (1958). *Huntley* was a standard vehicle damage subrogation case where the litigated issue was the insurer's right to settlement proceeds where the insured had separately settled for property damage and physical injury. A normal subrogation right is authenticated in result by the decision favoring the insurer on its subrogation interest against the insured who uncooperatively had settled without overtly protecting the insurance company. The validity of the subrogation right was recognized.

7. It is recognized that a number of cases, particularly medical malpractice actions, look at suits by the first tort-feasor against the aggravating second actor. We see no reason to differentiate the suit by the passive actor, second tort-feasor against the principally negligent original tort-feasor where the litigable purpose is allocation of damages from fault. *Cf.* 73 Am.Jur.2d *Subrogation* §§ 39 and 40 (1974).

We take heed of the statement of the Vermont court in *Norfolk & Dedham Fire Ins. Co. v. Aetna Cas. & Sur. Co.*, 132 Vt. 341, 318 A.2d 659, 662 (1974):

[T]he right of subrogation is a favorite of the law, and the tendency is to extend its application. It is highly equitable in character and is regarded as one of the benevolences of the law. * * * It is said that the concept of "voluntariness" should be strictly construed and limited. 16 [G.] Couch, [on Insurance] § 61:54 [(1966)]; 50 Am.Jur. Subrogation § 21.

There is very little in the record to establish how an indemnity theory might be demonstrated. Essentially, the complex and finely positioned elements of the three classes of indemnity litigation, *see Richardson Associates*, 806 P.2d at 811 n. 26, was never considered by the trial court in the initial decision of Judge Leimback to deny summary judgment on indemnity or the succeeding decision of Judge Spangler which applied a volunteer status delineation to grant summary judgment and finitely deny recovery. NUD's appellate brief does not alert us to what contractual or implied contractual relationship underlay its indemnity claim. Obviously, NUD had no contractual relationship with Central and its relationship with the Town based on the continued business under an expired franchise agreement is at best ephemeral for any indemnity analysis. Consequently, despite citation by the parties, *Pan American Petroleum Corp. v. Maddux Well Service*, 586 P.2d 1220 (Wyo.1978), which involved express contractual indemnity, provides minimal authority. *Cf. Richardson Associates*, 806 P.2d 790. Duty from contractual agreement or implied duty from a relationship of the parties is obviously required before any character of indemnity can be asserted as a viable theory for reimbursement when payments have been made to a tort damaged claimant.

At least on the issue of demand and nonconcurrence, *Pan American Petroleum Corp.* set the appropriate indemnity issue of law for this case. In *Pan American Petroleum Corp.*, 586 P.2d at 1225–26, addressing a situation where, as in the instant case, the indemnitor had declined to approve a proposed settlement or assume the burden of the defense, the court stated as follows:

> We find the better-reasoned rule to be that if an indemnitor declines to approve a proposed settlement or to assume the burden of the defense, then the indemnitee is only required to prove a potential liability to the original plaintiff in order to support a claim against the indemnitor. * * *
>
> * * * These matters structure a jury question as to whether (the indemnitee) made a reasonable, prudent, and good-faith settlement. At a trial on the merits, the jury should be instructed to consider the likelihood of a recovery against (the indemnitee), as well as the reasonableness of the settlement amount.

Realistically, at worst, this record leaves us with an issue of fact on the wisdom, propriety, and process of the injury and house destruction settlement. Separate from the unpresented basic question of how does indemnity arise, a jury question is presented in evaluating NUD's potential liability to Ferron and as to whether NUD made a "reasonable, prudent, and good-faith settlement." *Id.* at 1226. Therefore, summary judgment on the issue of indemnity is reversed and this claim is remanded for determination of whether a properly stated claim as a theory of recovery is presented both legally and factually and whether the tests of the theory are met by the factual evidence presented.

## IV. CENTRAL CONTRACTORS STATUTE OF LIMITATIONS ISSUE

This appeal raises an issue of first impression in Wyoming: whether or not the "relation back" limitations of W.R.C.P. 15(c) apply to an amendment of a complaint made to identify a defendant originally named fictitiously as "John Doe I" pursuant to W.R.C.P. 17(d) and made after the statute of limitations had run.

Resolving this issue requires interpretation of three Wyoming rules of civil procedure and a statute of limitations. NUD relies on the Wyoming fictitious name rule, W.R.C.P. 17(d), which provides:

> *Suing person by fictitious name.*— When the plaintiff is ignorant of the name of a defendant, such defendant may be designated in any pleading or proceeding by any name and description, and when the true name is discovered the pleading or proceeding may be amended accordingly; and the plaintiff in such case must state in his complaint that he could not discover the true name, and the summons must contain the words, "real

name unknown", and a copy thereof must be served personally upon the defendant.[8]

Central cites a second relevant rule, W.R.C.P. 3(b), which governs the commencement of an action, and provides in pertinent part:

> *When commenced.*—For purposes of statutes of limitation, an action shall be deemed commenced on the date of filing the complaint as to each defendant, if service is made on him or on a co-defendant who is a joint contractor or otherwise united in interest with him, within sixty (60) days after the filing of the complaint. If such service is not made within sixty (60) days the action shall be deemed commenced on the *date when service is made.*

(Emphasis added.)

The applicable statute of limitations involved was found in a joint tort-feasor contribution act adopted by Wyoming in 1973, W.S. 1–1–110 through 1–1–113 (1977). The act was in effect at the time of the accident, February 13, 1985, as well as on February 1, 1986, the date of the settlement, and the date payment was made to the injured party. W.S. 1–1–112(d) (1977), on the enforcement of the statutorily authorized contribution claim, provided as follows:

> If there is no judgment for the injury or wrongful death against the tortfeasor seeking contribution, his right of contribution is barred unless he has either:
>
> (i) Discharged by payment the common liability within the statute of limitations period applicable to claimant's right of action against him *and has commenced his action for contribution within one (1) year after payment* [.]

(Emphasis added.)

NUD commenced this action for contribution against the Town and four John Does on November 3, 1986, clearly within one year of payment on February 1, 1986. However, under W.R.C.P. 3, action was not commenced against Central until acceptance of the summons on July 20, 1988, which is almost two and a half years after NUD's payment. Central argues that NUD's action against Central is barred because it was not filed within the one year mandated by W.S. 1–1–112(d) (1977).

The third rule cited is W.R.C.P. 15(c) regarding the "relation back" of amendments to pleadings, which provides:

> *Relation back of amendments.*—Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

NUD points out that the Wyoming version of W.R.C.P. 15(c) is identical to the earlier version of F.R.C.P. 15(c), which was later amended in 1966 to add the following:

> An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

NUD argues that if the factors identified in the current Rule 15(c) are met, its amended complaint substituting Central for John Doe I relates back to the original complaint and further contends that analysis of these factors requires consideration of matters outside the pleadings making summary judgment on the statute of limitations issue inappropriate.

■ The cases considering both a fictitious name statute and the longer, amended version of Rule 15(c) have held that plaintiffs have a right to use John Does

---

8. It is worthy to note that while Wyoming's fictitious name rule, W.R.C.P. 17(d), permits amendment of the pleadings upon discovery of the defendant's true name, the rule is silent as to the "relation back" of the amendment and the statute of limitations.

and subsequently to amend their complaints. However, an amendment to a complaint substituting a named defendant for a fictitious defendant is considered to constitute a change of a party and will relate back to the filing of the original complaint and toll the statute of limitations only if the requirements of W.R.C.P. 15(c) are satisfied, i.e., the defendants actually had or should have had notice of the claim against them as to the occurrence in question.

In *Gould v. Tibshraeny*, 21 Ariz.App. 146, 517 P.2d 104 (1973), the plaintiff named fictitious defendants pursuant to a fictitious name statute nearly identical to Wyoming's fictitious name rule, then subsequently substituted Tibshraeny for one of the "Doe" defendants after the statute of limitations had run. The court held that the amended complaint did not relate back to the filing of the original complaint to toll the statute of limitations where the requirements of Rule 15(c) had not been met:

> It is fundamental that the purpose of the statute of limitations is to provide a cutoff point in time for stale claims. Rule 15(c) carries out this sound policy by requiring notice of the institution of the action within the time limitations set by the statute of limitations before an amendment adding new parties will relate back to the date of the original pleading.

*Gould*, 517 P.2d at 106. The first service of process followed amendment to substitute the actual name of the contended tortfeasor. Under this Arizona rule, amendment to change a fictitious name to an actual party constitutes a Rule 15(c) change of a party and criteria of the rule must be met to obtain benefit of the "relation back" result. *Medina v. Schmutz Mfg. Co.*, 677 P.2d 953 (Colo.App.1983), *overruled sub nom. Dillingham v. Greeley Pub. Co.*, 701 P.2d 27 (Colo.1985).[9] *See also Schiavone v. Fortune*, 477 U.S. 21,

106 S.Ct. 2379, 91 L.Ed.2d 18 (1986), which considered Rule 15(c) in conjunction with the related party amendment concept instead of the fictitious name change; and *Jacobson v. Union Story Trust and Sav. Bank*, 338 N.W.2d 161 (Iowa 1983), involving substitution of the executor of estate for the decedent. *See also Richardson Associates*, 806 P.2d at 799.

The Seventh Circuit Court of Appeals has held that a plaintiff's amended pleading substituting the true names of defendants for the fictitious names used in the original pleading did not relate back so as to avoid bar of limitations where, prior to service of summons on original fictitious defendants, they had no notice of the pending lawsuit. *Sassi v. Breier*, 584 F.2d 234 (7th Cir.1978). *Accord prospectively, Chacon v. Sperry Corp.*, 111 Idaho 270, 723 P.2d 814 (1986). *See also Gardner v. Fithian*, 128 Ariz. 353, 625 P.2d 942 (1981); *Hartford Ins. Group v. Beck*, 12 Ariz.App. 532, 472 P.2d 955 (1970); *Larson v. C.W. Matthews Contracting Co., Inc.*, 182 Ga. App. 356, 356 S.E.2d 35 (1987); *Sims v. American Cas. Co.*, 131 Ga.App. 461, 206 S.E.2d 121, *aff'd* 232 Ga. 787, 209 S.E.2d 61 (1974); *Berns Const. Co., Inc. v. Miller*, 491 N.E.2d 565 (1986), *aff'd* 516 N.E.2d 1053 (Ind.1987); *Lunn v. American Maintenance Corp.*, 96 Nev. 787, 618 P.2d 343 (1980); and *Vocke v. City of Dayton*, 36 Ohio App.2d 139, 303 N.E.2d 892 (1973). *Contra Sooy v. Petrolane Steel Gas, Inc.*, 218 Mont. 418, 708 P.2d 1014 (1985), *reversing Vincent v. Edwards*, 184 Mont. 92, 601 P.2d 1184 (1979).

With the passage of Rule 15(c), we follow the Arizona rule that the test is notice to the actual defendant and not necessarily diligence of the plaintiff attempting identification for amendment. *Cf. Younger v. Kracke*, 236 N.J.Super. 595, 566 A.2d 581 (1989).[10]

---

**9.** We do not consider the separate issue addressed by the Colorado Supreme Court in *Dillingham* which considers the rule provision for reasonable time (or for Wyoming, W.R.C.P. 3— 60 days) for actual service of process since in this case, the time beyond the expiration of the statute of limitations was nearly eighteen months. *O'Quinn v. Wedco Technology, Inc.*,

752 F.Supp. 984 (D.Colo.1990). *See however Ingram v. Kumar*, 585 F.2d 566 (2nd Cir.1978), *cert. denied* 440 U.S. 940, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), as cited in *Dillingham*.

**10.** There are clearly two different rules—one based on notice, the Arizona rule of which *Gould*, 517 P.2d 104 is illustrative, and the oth-

This record establishes that although NUD states in its complaints it notified the Town as to its pending settlement with the injured party, there is no allegation or evidence in the record that it notified Central of its claims or gave Central an opportunity to participate in the negotiations or settlement with the injured party. Thus, the notice requirement of Rule 15(c) necessary to effectuate a "relation back" amendment result is not shown in this record.[11] The trial court consequently properly dismissed proceedings against Central on the basis that the statute of limitations had expired. NUD had a right to use a fictitious name in the initial complaint; but, when amendment is made after the time permitted by the statute of limitations has passed, an amendment relates back for time computation only when the defendant had or should have had notice of a claim against it. *Vincent,* 601 P.2d 1184.

## V. CONCLUSION

The summary judgment granted to Central is affirmed, the summary judgment favoring the Town is reversed on all three theories—contribution, subrogation and indemnity.

It is, however, important to recognize the limited scope of this decision upon reversal and remand. We determine that contention of volunteer status is a factual issue unsuitable for summary judgment dismissal adverse to NUD. We also determine that no principle of non-assignability necessarily forecloses part or total subrogation of the payments made against the Town. Beyond these decisions, a near multitude of legal and factual questions remain unaddressed by either the trial court or this decision. One of these questions is whether either partial or total subrogation can be realistically applied considering that contribution requires a demonstration of non-volunteer status, e.g., joint tortfeasor participation, as well as the existence of unclear concepts about indemnity application.

Procedurally, in order to achieve contribution assessment, NUD had to first contend and prove non-volunteer status which is derived from some character of joint tort-feasor sequential conduct. For NUD, this is not a *respondeat superior* case, but is instead a sequential act situation. The second anomaly or factual cloud is establishment of the basis of the Town's liability, e.g. direct tort, contractual, or *respondeat superior* by differentiation from negligence of its contractor. The next issue unaddressed by evidence or theory development is the difference between the status of NUD as the assignee of State Farm's casualty loss payment to Ferron, which claim, in itself as to State Farm, was clearly subject to subrogation and its second status derived from its first-party payment to Ferron for injury damage resulting from contended principal party negligence. The first party settlement might also have included property damage aspects.

In this bodily injury subrogation, NUD sought to recover from its co-participant/joint tortfeasor Central and/or Town. Active/passive negligence concepts may creep into legal theory development, none of which have presently been considered by the trial court nor presented in appellate briefing. Primary and secondary liability issues have not been researched or determined by the trial court. *See Richardson Associates,* 806 P.2d at 813 and cases cited therein. *See also Centric Corp. v. Drake*

er, a diligence rule, where a Rule 15(c) provision does not exist or is differently applied of which New Jersey, *Younger,* 566 A.2d 581, and California, *Smeltzley v. Nicholson Mfg. Co.,* 18 Cal.3d 932, 136 Cal.Rptr. 269, 559 P.2d 624 (1977), are illustrative. See a discussion of the difference in *Kiehn v. Nelsen's Tire Co.,* 45 Wash.App. 291, 724 P.2d 434 (1986) and *Wakuya v. Oahu Plumbing & Sheet Metal, Ltd.,* 65 Haw. 592, 656 P.2d 84 (1982). Actually, either rule would preclude a "relation back" here for statute of limitation purposes.

11. The interrogatory request inquired as to work between 1970 and 1985. NUD argued it was mislead by the Town's answer because it refers to work performed by Central in 1987, which was in error. The fact the answer was outside the scope of the question, and was given on a date almost contemporaneous with the erroneous date, should have alerted NUD to make further inquiry.

*Bldg. Corp.,* 726 P.2d 1047 (Wyo.1986), where the court recognized the difference between the tort remedy of contribution and the contractual basis of indemnity. Not the least of many interesting concepts presented is the independent contractor defense of the Town since we have now removed the contractor from the litigation arena. *See Allmaras v. Mudge,* 820 P.2d 533 (Wyo.1991) (No. 90–275, decided 11/8/91). Furthermore, we neither examine nor determine whether an indemnity claim is properly stated for pleading purposes. If it is, there is less than clarity in description, and consideration by this court is now untimely since we are unassisted by briefing or argument.

By this decision in regard to the litigation between NUD and the Town, we only decide that factual issues exist regarding the volunteer status where the utility paid $90,000 and that a non-assignability preclusion cannot as a matter of law be applied to deny assessment to a right to subrogate. We decide no more.

Reversed and remanded for further proceedings in accord herewith.

THOMAS, Justice, specially concurring.

I agree that the case was not ripe for the entry of summary judgment on any of the theories of liability asserted by Northern Utilities Division of K N Energy, Inc. (NUD) against the Town of Evansville (Town). I join in the reversal of the summary judgment entered in favor of the Town.

I am not persuaded, however, that the right of NUD to contribution "rests upon the question of whether NUD and the Town are joint tort-feasors." Maj. at 833. The authority for that proposition is drawn from *Garner v. Hickman,* 709 P.2d 407 (Wyo.1985), and I find that case doubtful authority when it is recognized that the Garners' action against Hickman was for breach of contract, and their action against the Sundance State Bank was for fraud, bad faith, and unfair dealing. The legal theories asserted against the two defendants in that case were not such as to allege "the same injury to * * * property"

so as to structure a right of contribution by Garner against the bank pursuant to Section 1–1–110, W.S.1977, (right to contribution among joint tortfeasors) repealed ch. 24 § 2, Wyo.Sess.Laws (1986).

I prefer to analyze the right to contribution under the statutory language then in effect which read:

"(a) Except as otherwise provided in W.S. 1–1–110 through 1–1–113, where two (2) or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them." § 1–1–110(a), W.S.1977.

The record, as the majority explains, amply demonstrates the potential for this situation to fit within the statute. We are not called in this case, any more than we were in *Garner,* to become involved in a discussion of whether the operation of the statute would be limited to those who are joint tort-feasors as defined in Black's Law Dictionary.

I am in accord that the summary judgment against Central Contractors Co., Inc. must be affirmed.

CARDINE, Justice, specially concurring.

I concur in the court's disposition of this appeal, except that I do not wish to be understood as agreeing that indemnity is available. I seriously doubt that appellant can sustain a claim against the Town in indemnity on the facts that now appear in this case.